## SOUTHWESTERN BELL TELEPHONE CO. v. CITY OF SAN ANTONIO et al.

### No. 377.

District Court, W. D. Texas, San Antonio Division.

Feb. 20, 1933.

Nelson Phillips, of Dallas, Tex., John Boyle, E. D. Henry and John H. Bickett, Jr., both of San Antonio, Tex., William H. Duls, of Dallas, Tex., and E. W. Clausen, of St. Louis, Mo., for plaintiff.

Joseph Ryan, City Atty., T. D. Cobbs, Jr., Asst. City Atty., Bruce W. Teagarden, and Carl Wright Johnson, all of San Antonio, Tex., for defendants.

HOLMES, District Judge.

The Southwestern Bell Telephone Company seeks to restrain the enforcement of an ordinance of the city of San Antonio, approved June 20, 1918, prescribing exchange rates for telephone service within the city. The basic rates ordained are, per month, $3 for exchange service for residential uses, and $7.50 for commercial purposes. Prior to the institution of this suit, the plaintiff applied on February 7, 1928, to the city board of commissioners (a local rate-making body) for permission to increase its exchange rates, upon the ground that the existing rates were confiscatory of its property. The increased basic rates requested, and which are now in effect under a temporary order of this court, were $4 and $9, respectively.

On February 16, 1928, which date had been duly appointed to hear the application, the plaintiff and the city appeared before the board, and the former offered proof of the facts alleged with reference to the value of the property and the operation of existing rates. No evidence was introduced, except by the telephone company. The hearing continued to a conclusion on the following day, February 17. After the petitioner had rested its case, the attorney for the city thought it was

not necessary for him to offer any proof, and made a motion that the application be denied. Thereupon a vote was taken, and the application of the telephone company for an increase of rates, as prayed for in its petition, was finally denied by the board. Following the denial, the plaintiff's suit was filed on March 26, 1928, and a restraining order immediately granted by a judge of this court. Thereafter, April 2, the answer of the defendants to the merits was filed. A temporary injunction followed, and issues presented upon the bill and answer were referred to a master on April 23, 1928. Hearings on the merits began before the master on October 15, and were concluded on December 17, 1928. Time was necessarily allowed for the preparation of briefs to be filed with the master, and such briefs were duly filed.

The original report of the master was filed on March 3, 1930, in which it was found that the ordained rates were confiscatory and was recommended that the injunction be made perpetual. Exceptions to the master's report were duly filed by the city, and argument before the court on the exceptions so filed was had on August 11, 1930.

Before final action on the exceptions was taken by the court, a decision was handed down on December 1, 1930, by the Supreme Court of the United States, in the case of Smith v. Illinois Bell Telephone Company, 282 U. S. 133, 51 S. Ct. 65, 71 L. Ed. 255, which announced several legal principles vital to the master's report, and which suggested the necessity of further evidence and additional findings before the contention of the plaintiff that its property was being subjected to confiscatory use by the public could be sustained. Accordingly, on January 26, 1931, the court made an order directing that the report be returned to the master and the cause again referred to him for further consideration, the reception of additional evidence, and further findings in the light of the recent decision above mentioned. It was also provided in the order that the re-reference was made without prejudice to the rights of either party to file additional exceptions to any further ruling or report of the master, to the same extent as if no previous report had been made.

On re-reference, hearings on the merits were held by the master beginning September 28, 1931, and continuing to October 13, 1931, at which time plaintiff closed its case in chief. Defendants then asked for time before presenting their proof, and the hearing was postponed until November 9, when the defendants asked for further time, which was granted. After other successive postponements, the hearings were resumed on January 11, and continued without further interruption until January 23, 1932, when the testimony was concluded.

The record of the testimony before the master on both references comprises a total of 7,203 typewritten pages. In addition, 143 exhibits were introduced, some of them voluminous. The two reports of the master cover over 100 printed pages, and there are before the court on the merits printed briefs of about 1,300 pages.

The master's report under the re-reference was filed on May 25, 1932. It set forth additional findings, and concluded that the rate of return which would have been realized under the rates in suit was unreasonably low in each of the years 1927, 1928, 1929, and 1930, and recommended that the enforcement of the city ordinances prescribing them, and fixing penalties, be perpetually enjoined, with the reservation that, if existing conditions should change so that the prescribed rates should be no longer confiscatory, the city might apply to the court for a proper modification of the decree. Exceptions to this report also were duly filed by the defendants. Oral arguments upon exceptions to both reports were heard by the court on August 3, 1932. At the beginning of this argument there was presented to the court for the first time a motion filed by the defendants a short time before, that is, on June 13, 1932, to dismiss the bill of complaint, because, it was alleged, the plaintiff had failed to exhaust its remedy before the board of city commissioners by introducing all of the evidence necessary for the board to have before it in order to exercise its regulatory powers with reference to the rates in controversy. The motion asked in the alternative that the suit be stayed until the company had been given an opportunity to renew its application to the board and to furnish the additional evidence, and, upon failure so to do within a reasonable time, that the suit be dismissed.

 There is nothing in the allegations of the bill upon which a contention that the suit was prematurely filed can be predicated. On the contrary, they show the right of the plaintiff to invoke the protection of the court. With the bill making no such disclosure, and since the premature filing of a suit is not jurisdictional in any sense, the objection is one which, under Equity Rule 29 (28 USCA § 723), may be raised only in the answer, by way of abatement. It may be waived, and

was waived in this case when the defendants filed their answer and proceeded to a trial upon the merits without in any manner or form presenting in the answer the matters upon which the motion to dismiss is founded. In no pleading other than this motion have the defendants raised the question.

A bare recital of the history of the case is sufficient to demonstrate that, even if permissible under the equity rules, a dilatory motion of this kind may not be interposed for the first time after the cause has been pending on the merits for more than four years, during which time much testimony has been taken on the merits and many hearings had, in all of which defendants have participated fully and freely.

Finally, the question at best is merely one of comity, and, as under the facts it is obvious from the attack made upon the testimony in the pending exceptions to the master's report that further proceedings before the board would produce no change in the result, and would be a vain and useless thing, accomplishing nothing, there can be no warrant for denying the plaintiff a hearing at this time upon the merits of the issues presented by the pleadings. The order of the board denying the application for the increase of rates was final; no further administrative remedy was available, and consequently, the judicial stage in the controversy was reached and the judicial remedy rightfully sought. Therefore the motion to dismiss the bill or stay the proceedings will be overruled.

Equity Rule 61½ (28 USCA § 723) requires that "the report of the master shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed." This rule has been given due weight, but the importance of the issues, the public interest being involved, and a pertinent decision coming down after the master had filed his original report, the doctrine of which was not wholly embraced by him even on re-reference —these things have seemed to emphasize the duty of a painstaking examination by the court of the entire record and briefs. What was said in Knoxville v. Knoxville Water Co., 212 U. S. 1, 8, 29 S. Ct. 148, 150, 53 L. Ed. 371, while uttered with reference to the attitude of an appellate tribunal to findings of fact by a master which had been confirmed below, is applicable in this court with equal if not with greater reason: "We need not stop to consider what the effect of such findings would be in an ordinary suit in equity. The purpose of this suit is to arrest the operation of a law on the ground that it is void and of no effect. It happens that in this particular case it is not an act of the legislature that is attacked, but an ordinance of a municipality. Nevertheless the function of ratemaking is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power. Prentis v. Southern R. Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150; Honolulu Rapid Transit & Land Co. v. Hawaii, 211 U. S. 282, 29 S. Ct. 55, 53 L. Ed. 186. There can be at this day no doubt, on the one hand, that the courts, on constitutional grounds, may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and where that invalidity rests upon disputed questions of fact, the invalidating facts must be proved to the satisfaction of the court. In view of the character of the judicial power invoked in such cases it is not tolerable that its exercise should rest securely upon the findings of a master, even though they be confirmed by the trial court. The power is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question, sometimes be regarded as conclusive. All that is intended to be said is, that in cases of this character this court will not fetter its discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit." See, also, Cumberland Tel. & Tel. Co. v. City of Louisville (C. C.) 187 F. 637, and San Joaquin & Kings River Canal & Irr. Co. v. Stanislaus County (C. C.) 191 F. 875, 879. However, the extraordinary size of the record and the multiplicity of questions presented in this case are such that, if the conclu-

sions of the court are to be stated within reasonable limits, no elaboration of its views can be permitted.

The plaintiff admits the power of the city to regulate telephone rates within its corporate limits, and does not deny that the ordinance of June 20, 1918, was valid when enacted and at all subsequent times prior to 1924. It insists that, owing to the continuous growth of the city, it has been necessary to. make extensive additions to its plant, and incur increased operating expenses, in order to furnish adequate and efficient local service. It says "existing rates have become wholly insufficient."

█ It is incumbent on the plaintiff to show the. present value of its property, used and useful in rendering service, and its net earnings under proper management. If its plant were an isolated one, independently owned, furnishing local exchange service only, keeping correct accounts, and fairly, efficiently, and economically operated, the task would be comparatively easy. But such is not the case. The Southwestern Bell Telephone system extends over five entire states and part of a sixth. It furnishes exchange and toll service over this vast territory. It has financial dealings running into the millions with parent and sister corporations; from one of which it has purchased practically all of its property in San Antonio, except land and buildings. In addition to its own business, it controls other telephone companies, to which it lends money and in which it owns stock. It has many local exchanges which, like the one under consideration, are operated in conjunction with its toll business.

█ The issue for determination is not whether the company is earning an adequate net revenue on its entire properties, but whether the rates fixed for local exchange service in San Antonio are sufficient to permit the plaintiff to earn, if it can, a fair return on its property. devoted to the public use within the jurisdiction of the city. The burden is upon the utility to segregate its properties, revenues, and expenses so as to carve out those within the jurisdiction of the regulatory body whose rates are being assailed as confiscatory. The necessity may arise to allocate values and· prorate expenses, but, in the diversity of uses, the immensity of the relations, and the complexity of the accounts, it should constantly be kept in mind that the rate assailed is for a local service, and that values, revenues, and expenses should be appraised and estimated solely with

reference to the local business with which we are solely concerned.

█ Being a public utility, the plaintiff's business is subject to governmental regulation. Being engaged in local, state-wide, and interstate service, the regulation may come from municipal, state, and federal authorities. So long as the utility complies with the valid orders of the governing body to which it owes obedience, it may affiliate its business and manage its internal affairs in such manner as to it seems proper. This is a prerogative of corporate ownership which remains with the stockholders and directors; but the right to manage one's own business may not serve to shift the burden of proof when a plaintiff seeks to strike down regulations made under state authority on the ground of their unconstitutionality.

█ This burden is to prove beyond a reasonable doubt by competent, relevant, and substantial evidence "such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 S. Ct. 148, 153, 53 L. Ed. 371. In L. & N. Railroad Company v. Ry. Commission (D. C.) 208 F. 35, 42, a case from our own circuit, the court said: "Another rule for our guidance is that the burden of proof is not only placed on the plaintiff but that the plaintiff is required to do more than offer a mere preponderance of evidence. The judiciary is not permitted to interfere with the rates established by legislative authority unless it is made to appear clearly and beyond reasonable doubt that they are unreasonable and that their enforcement would be equivalent to the taking of property for public use without just compensation. If the evidence offered leaves the court in doubt, if it is not clear, satisfactory, and convincing, the rate fixed by state authority should not be ·enjoined. San Diego Land [& Town] Co. v. National City, 174 U. S. 739, 754,· 19 S. Ct. 804, 43 L. Ed. 1154; St. Louis & S. F. R. R. Co. v. Gill, 156 U. S. 649, 666, 667, 15 S. Ct. 484, 491, 39 L. Ed. 567, 573. So stringent are these rules against the interference with the action of the local authorities in fixing rates that it has been said that the court should not enjoin a rate unless it can hold 'that it was impossible for a fair-minded board to come to the result which was reached.' Knoxville v. [Knoxville] Water

Co., 212 U. S. 1, 17, 29 S. Ct. 148, 153 (53 L. Ed. 371). These rules are not mere cautionary phrases. They are intended to mark the limits of judicial interference. If the inferior courts will regard these principles, not as platitudes, but as rules prescribed for their guidance, it will greatly lessen legislation and litigation in relation to the regulation of the tariffs of public service corporations."

The master found that this burden had been met by the plaintiff, which presents a question common to both reports of the master, and which is interwoven with his several findings on values, revenues, and expenses. Even his alternative findings were not segregated so as to be free from it. In his original report, he approved the contention that, under its power of management, the plaintiff had so classified its service that every call beyond the city limits begins and ends at the toll board for rate purposes, and that the portion of an interstate toll call between the subscriber's station and the toll board is a local exchange service. He allocated to the value of exchange property not only all uses thereof of a purely local nature, but also all long-distance messages between the toll board and the subscriber's station. He attributed to toll use only that portion of the property which carried the communication from the toll board to its destination beyond the city. The result was greatly to enhance the valuation of the exchange property and to minimize that of toll, although toll service is available to all local subscribers and 87 per cent. of them actually use it, and although it requires more expensive equipment to make every phone a long-distance phone.

In Smith v. Illinois Bell Telephone Co., supra, it was held that a segregation of property, revenues, and expenses is essential to the appropriate recognition of the competent governmental authority in each field of regulation. The court said, at page 149 of 282 U. S., 51 S. Ct. 65, 69, 71 L. Ed. 255: "In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed. Minnesota Rate Cases, 230 U. S. 352, 435, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. As to the value of that property, and as to the revenue and expenses incident to that business, separately considered, there should be specific findings. Railroad Commission v. Maxey,

281 U. S. 82, 83, 50 S. Ct. 228, 74 L. Ed. 717."

In his report on re-reference, the master adhered to his original view because he did not construe the Smith Case, supra, as disapproving his original report. He interpreted the decision as containing no more than "a statement that the various uses of telephone plant should be recognized, and the property, expenses, and revenues should be properly segregated." In his second report, the master said: "Toll cannot use exchange plant and exchange cannot use toll plant. The customer uses the plant either in connection with transmitting toll calls or in connection with transmitting exchange calls, but the use is always customer use. The customer pays for that use. If the customer pays for it but once, and a reasonable amount when he pays it, he has no complaint; nor does the company have a complaint if it is compensated once for each use of its property."

While not conceding the Smith Case to hold that a toll call originates where it physically begins, that is, at the subscriber's station, on that assumption proof was introduced by the plaintiff, on which the master predicated his alternative findings, which purported to give recognition to toll uses of exchange property. The proof on re-reference, as in the original hearings, ignored the separate elements of values, revenues, and expenses resulting from joint use, and proceeded to bring down to date findings for the years 1928, 1929, and 1930, just as had been done before for 1927. The proof was presented on the same theory and applied in the same way; the only variation being in the facts of the particular years. Having done this, the telephone company then offered proof of "this so-called station to station theory"; but in so doing its attorney made it plain that he was not subscribing to it, and added: "However, we are going to put that testimony in just as scientifically as we can do an unscientific thing, just as practically as we can do an impractical thing, and we will do it, and having done it we will submit it as a mathematical compilation without assuming any of the responsibility." It was on this testimony that the alternative findings of fact were made; the master himself expressly dissenting from their correctness because of the right of the company to make a reasonable classification between its toll and exchange business.

Imbedded in the alternative findings, and ingrained in the testimony in support

618

of them, is an adherence to the board to board theory of rate making as a corporate right of business management. The mathematical complications involved in these findings, and the undue burden which the results obtained cast upon the exchange rate payer, were caused by the fact that the books and accounts of the plaintiff had been kept so as to amalgamate the joint uses and expenses, and the testimony of the witnesses as to values had been directed to a joint instead of a separate use. Both primary and alternative findings contain figures which, in the absence of direct proof, are presumed to be correct because of corporate action under an asserted right of business management. In some instances the results are arrived at only by an inference upon an inference. This is particularly glaring in matters of prorating expenses between local and long-distance uses, and in allocating to the San Antonio area a portion of general expenses incurred elsewhere in the system. The prorations are made on different bases or theories of apportionment without any apparent reason for distinction. Advertising expenses are divided between toll and exchange on a basis of revenues only, which was expressly condemned in the Minnesota Rate Cases as to legislative action in rate making, and of course corporate action occupies no stronger ground in a rate controversy.

In the telephone business there is an irrepressible rate conflict between toll and exchange patrons. It underlies the whole controversy in this case. The effect of approving the plaintiff's method of allocating the uses, revenues, and expenses of its plant would result in loading the exchange rate with values and expenses which are partly attributable to long-distance business, without adequate compensation therefor out of toll revenues. The San Antonio plant has an aggregate value which is made up of various elements, including the uses to which it is put for revenue purposes. For rate making this entire value may be divided into amounts in proportion to the uses of the property in municipal, state, and interstate telephone service. Such a division is reasonable because such uses have a factual relation to such amounts, and such amounts have a legal relation to municipal, state, and interstate regulations. To obtain the rate base for the local exchange area, it is necessary to separate the whole value into its component parts and to eliminate those parts over which the city board has no jurisdiction.

 There is no claim here that any property is being confiscated in state or interstate service, though it is clear that practically the entire plant is jointly so used. The claim is that, in so far as the property is used solely as a local exchange, it is being confiscated by insufficient local rates. The problem is one of valuation of jointly used property with the object of obtaining its value for one of the uses only, namely, the local exchange use. It was the duty of the master to ascertain that value not by attributing the entire reproduction cost and every other element of value to exchange, and then deducting such values as the plaintiff, under its power of management, arbitrarily denominated "toll," but by arriving at an independent estimate of the value of the property used and useful as a local exchange, and to this end to bring to bear upon all the evidence a "reasonable judgment having its basis in a proper consideration of all relevant facts." Minnesota Rate Cases, 230 U. S. 352–354, 33 S. Ct. 729, 754, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

 The same conflict is present in matters of expense. The major portion of expenses allowed by the master does not represent money actually spent at, for, or in connection with the San Antonio exchange. If that amount alone were considered, it must be admitted that the charge of confiscation would fail. The undisputed evidence shows that the telephone company kept no separate and distinct records of the actual expenses of operation of the San Antonio exchange. It attempted to make this proof by the testimony of an auditor who depended upon hearsay for much of his data and who arrived at his conclusions by various arbitrary methods of apportioning items between toll and exchange business, or between state, division, or exchange area, or in some other way. Only those expenses should be considered which are requisite to the efficient and economical operation and maintenance of the local business; but the plaintiff has not kept its books and accounts so as to show the expenses of the San Antonio exchange apart from state or division expenses, nor segregated from expenditures on account of toll business. The master has approved the plaintiff's effort to charge to the San Antonio exchange items of operating expenses not upon a basis of fact or of proportionate use, but upon an arbitrary basis having no logical relation to either. In addition, many amounts were included because the books of the company showed that the money had been actually spent by the plaintiff in the state, or elsewhere, and the presumption was indulged that it had been properly spent. If the concession be made that this was a proper infer-

ence, the San Antonio exchange was not shown to have had any relation to the expenditures. But, proceeding upon the presumption just mentioned, the company, under its corporate right of management, undertook to allocate large amounts to San Antonio's local business, and, from this exercise of a power to classify and manage its business, the master presumed that the apportionments were proper. We have then only a presumption that the money was properly spent for the whole system, deduced from the book entries that it was actually spent, and from the first presumption it is necessary to presume that it was properly allocated before any part of it may be charged to the local exchange in estimating its rate of return under the ordinance. We have then a presumption upon a presumption, which is inadmissible. When it is recalled that rate making is a legislative right, which is presumed to have been validly exercised in this case, we perceive the impropriety of permitting the presumption of validity attaching to corporate action to overcome and annul the presumption of validity legally drawn from the exercise of the power to prescribe telephone rates.

The conflict as to revenues assumes a different aspect. There is no dispute in the record as to the gross amounts received by the plaintiff for services rendered in the San Antonio exchange during the years under review. The collections were kept separately in the matter of toll and exchange charges. The controversy in this regard is over the specific character of service that is paid for in the exchange rates. In his final report the master said: "According to the record in this case as originally made, and upon rehearing, there can be no doubt whatever that the service between the subscriber's station and the toll plant is paid for in the monthly flat rate, and nowhere else. The right of the company to manage its business entitles it to make rates on that basis, provided such a classification is reasonable. The record shows that it is reasonable." Referring to the case of Smith v. Illinois Bell Telephone Co., supra, he stated: "There is no holding, and there could not well be, that the Telephone Company has not in the past always sold its local service for a rate which included connection with the toll lines. On the record, this is admittedly the generally accepted basis of the sale of telephone service."

If it be conceded that, in the absence of specific legal restrictions against the practice, a telephone utility may classify its business so as to furnish local and long-distance service for a single flat rate, it by no means follows that the customer is not employing toll service from station to station in communications beyond the local area, and exchange service within the area, just as a passenger may travel interstate on one trip and intrastate the next, over the same road. Whatever may be the power of control in the officers of a corporation, in a case of this character the matter for determination is whether the maximum exchange rate fixed by state regulation is so low as to amount to confiscation of the company's property. If in this case there is a joint rate, it has been voluntarily given; and, if it is resulting in insufficient revenues, it may be voluntarily abrogated; but a joint indivisible rate in excess of the ordained local rate should be regarded as an evasion of local regulation, and should not be sanctioned in a court of equity, in a case where the utility has the burden of proving its averment of confiscation.

The defendants say that the plaintiff in the operation of its business is not consistent in its contention. For instance, local calls from pay stations are 5 cents each. If one uses the pay station, he deposits 5 cents, which sum inures to the benefit of the local exchange revenues. If the same person calls and gets long-distance service, the 5-cent coin so deposited is returned to him, and the local exchange receives no compensation for this call. Also, there is measured service, under which a person is entitled to so many calls at a flat rate. When the allotted number is exhausted, the subscriber pays 2 cents for each extra call, except when he calls the toll operator. Again, some patrons restrict their telephones to local use, yet they are required to pay the same rate as those who have the privilege of calling the toll board. These customers are forced to pay for toll service against their will and without getting it.

 Other inconsistencies are urged by the city attorney, but the shortest answer to the contention that long-distance service is included in the exchange rate is that the city ordinance does not require it. The board of commissioners has not the power, and has not attempted, to fix rates for such service. The question in this case is not what revenues the plaintiff is earning, but what it may earn. The determinative revenue is not the amount that has been derived from the rates actually charged by the company, but it is the amount that may be derived from rates permissible under the ordinance. The plaintiff may obtain relief by raising its exchange rates to the limit fixed by the regulatory board, but, if it has failed to do so, no element of value or

expense attributable to long-distance uses should be included in estimating the rate of return which may be earned under the ordinance. Moreover, under the theory of a joint rate, no one knows what either rate is, and, while the ordinance permits a certain maximum charge for exchange uses, the company claims it has been charging a smaller unascertained amount.

■ An exception by defendants to the report is with reference to the cost of the physical exchange property in San Antonio. The master found that this "total book cost" was $5,632,816. All of his other findings as to value gave material consideration to this amount. The original cost of plaintiff's property, if shown by competent evidence, is a relevant fact to be considered in arriving at a fair value, but the master treated the book cost as if it were the same as the original cost, which was not true under the facts of this case.

■■ The evidence shows that it is impossible to ascertain the original cost of the plaintiff's property located in San Antonio, because there are no available records of the same. It appears that in 1915 the plaintiff had an appraisal made of its property to show its entire reproduction cost new at that time. This appraisal included overheads, but the amounts thereof or by whom the same were made are not shown. It further appears that the books of the San Antonio exchange in 1920 were changed so as to show the new appraisal of 1915 with additions to date. I think the master erred in admitting this testimony and in giving material effect to it in his findings. It is true original cost is only one element of value. There are other elements and other methods of showing value, but the appraisal engineers who testified for the plaintiff, and whose estimates were approved by the master, also adopted this inadmissible book cost item as an element of value in giving their testimony on the subject, and their estimates would seem to be infected with the same infirmity.

Plaintiff also attempted to show the original cost by its witness, Mr. Scott, and to support its appraisal engineers' estimates by showing that the former furnished the latter "with the figures of the original cost of this exchange property as shown by the books." Scott testified that he actually furnished Snell with that figure. This testimony, taken alone, would appear to be sufficient, but, taken in connection with his cross and redirect examinations, it is shown to be not a statement of fact within the knowledge of the witness, but

of opinion based purely upon hearsay and surmise. The testimony was admitted over defendants' objections.

Defendants also objected to the master's findings of "book cost" and "original cost," because each of said findings is predicated upon Western Electric prices, which enter into the original cost of practically all the property under consideration, except land and buildings. R. H. Gregory, comptroller of the Western Electric Company, was the only witness on this subject. He testified that the books of his company do not show the profits made on sales to the Bell Companies. He attempted to arrive at the profits by methods of allocation and apportionment between Bell and non-Bell business. The result is not satisfactory, and falls short of clear proof that only reasonable profits have been exacted from the plaintiff, who was compelled to buy from it. The Western Electric Company is in effect the manufacturing department of the dominant company, the American Telephone & Telegraph Company. The master in his findings has adopted these prices and given full effect to them.

The record shows that the Western Electric Company grew from a capitalization of $1,000,000 in 1881 to about $15,000,000 in 1915. At the end of 1915 its net assets were about $40,000,000, and during all of this time it declared and paid dividends. In 1930 the percentage of its investment devoted to Bell business alone had risen to about $277,000,-000. It also owns other companies which have been acquired by it. It is a reasonable inference that the nucleus of its whole growth and profits was its dealings through and with the American and Bell Companies, or at least there is no showing to the contrary.

It has been the practice of the Western Electric Company annually to charge as expense to costs of its goods manufactured the current depreciation of its plant. It does not appear, and we have no way of knowing, whether these charges were excessive. At this time there is still a balance of $74,000,000 by way of a surplus in the book reserve above the amounts actually used for replacements. The charges may be entirely proper, but there is no evidence upon which the master could so find. In addition to the regular depreciation in the years 1924 to 1927, $8,900,000 was charged to expense to cover anticipated declines to 1940. This may be compared to an item of $8,233,412, which was the Bell portion of an extraordinary reserve for depreciation. There are also many other millions deducted from the inventory which may or may not be correct. If they are improperly

deducted, the effect of it is to show an understatement of profits to the extent of about $19,000,000.

During the period from 1916 to 1930, there was about $92,286,000 for expenses charged to the Bell business for research work, development of new ideas, and patents. Some of these matters have been utilized through licenses of patents, manufacture and sale of goods to others, and by other subsidiary companies. No part of the value of these patents or the profits from these utilizations is given to the Bell business to offset the cost of development. This necessarily affects the revenues and expenses, and causes an underestimate of the profits of the Western Electric Company in its dealings with the plaintiff.

It is an indisputable fact that no proof has been attempted to be made by the plaintiff with regard to Western Electric profits on the items of property existing in the San Antonio exchange. It of course would be relevant to show its profits on the various kinds of equipment and apparatus in the exchange under review, but it is not necessary to pass upon whether such proof is required, as plaintiff has failed to show reasonable profits, in whole or in part, as to Western Electric prices, either in its general business with the plaintiff or the Bell Companies. In concluding the proof on this issue, counsel for plaintiff said: "We rest on the Gregory testimony at our peril." From this statement it is reasonable to infer that no better proof will be offered or is available. The conclusion is that the plaintiff has failed to meet the burden of proof with reference to the reasonableness of the Western Electric prices and profits. The testimony of Mr. Gregory, including the exhibits introduced in evidence as a part thereof, fails to convince the court beyond a reasonable doubt that the prices were fair and reasonable.

In both reports the master adopted the estimates of plaintiff's witness, Mr. Snell. In his report on re-reference, the master said: "The master adopted Mr. Snell's figures for 1927 for the reasons stated in his original report. He has proceeded upon the same theory for the ensuing years, and, so far as it was possible, used the same methods."

Mr. Snell, in his estimate of reproduction cost of right of way, included the sum of 50 cents per pole for municipal permits, or $8,325 for the year 1927. One or more poles may be included in a single permit, and it is inconceivable that a construction engineer or contractor would be so lacking in economy as to get a separate permit for each pole. While it is not likely that in practice the setting of all poles could have been provided for in a single permit, it is equally true that the other extreme need not and would not have been adopted by a prudent man in rebuilding the plant. Here again arises the necessity for a fact-finding tribunal "to bring to bear a reasonable judgment upon all relevant facts."

Mr. Snell, in his estimate of reconstruction costs, took the average fair market value of the land as shown by the plaintiff's witnesses (which was higher than that shown by defendants' witnesses), and added thereto amounts for omissions and contingencies, 5 per cent., incidentals, 2 per cent., engineering, 1 per cent., general administration, 9/10 of 1 per cent.; and he further added to this amount taxes and interest during construction. These amounts were relatively increased for each of the subsequent years. The inclusion of these constituted error as a matter of law. In the Minnesota Rate Case, 230 U. S. 352, 455, 33 S. Ct. 729, 762, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court said: "Assuming that the company is entitled to a reasonable share in the general prosperity of the communities which it serves, and thus to attribute to its property an increase in value, still the increase so allowed, apart from any improvements it may make, cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture. We therefore hold that it was error to base the estimates of value of the right of way, yards, and terminals upon the so-called 'railway value' of the property. The company would certainly have no ground of complaint if it were allowed a value for these lands equal to the fair average market value of similar land in the vicinity, without additions by the use of multipliers, or otherwise, to cover hypothetical outlays. The allowances made below for a conjectural cost of acquisition and consequential damages must be disapproved; and, in this view, we also think it was error to add to the amount taken as the present value of the lands the further sums, calculated on that value, which were embraced in the items of 'engineering, superintendence, legal expenses,' 'contingencies,' and 'interest during construction.' "

Other exceptions are taken by the defendants to alleged duplication of overhead charges. For instance, plaintiff's witness Mr. Robinson gave the contract price

622

complete for certain buildings. Except as to architect's fees, he said, this price covered everything, including contingencies and omissions and a bond to guarantee delivery of the buildings. Mr. Snell accepted these figures and added 5 per cent. for omissions and contingencies, 3 per cent. for engineer's fees, 7½ per cent. for architect's fees, and 9/10 of 1 per cent. for general administration, a total of 15.6 per cent. It is obvious that such overloading of reconstruction costs is inadmissible. The total of this item for the year 1927 amounted to $62,401. Mr. Robinson, in his testimony as to the contract prices for the buildings for the years 1928, 1929, and 1930, took his 1927 figures and equated the same to reconstruction prices for the latter years. In reference to central office telephone equipment, Mr. Snell used Western Electric prices, which included the equipment installed; yet he added 3 per cent. for contingencies and omissions, 5 per cent. for engineering, and 9/10 of 1 per cent. for general administration. This is a total of 8.6 per cent., which seems excessive.

 Mr. Snell's estimate of $701,853 for 1927, for interest during construction, is 13 per cent. or 14 per cent. of the value of the property, and seems too high, as does his estimate of $107,263, for 1927, for taxes during construction. These estimates are rendered high by the assumption of a five-year construction period. Equated figures were carried forward for the subsequent years 1928–1930. It appears in evidence that the percentage in such cases for interest during construction usually ranges from 3½ per cent. to 6 per cent., and that the percentage actually used by the Bell Company in the New York telephone case for interest during construction was 3.86 per cent. It is stated in New York Telephone Co. v. Prendergast (D. C.) 36 F.(2d) 54, that a construction period of six years in the city and five years in the balance of the state was assumed for New York city and state, but the difference in the sizes of the plants is obviously a matter for consideration. Mr. Snell's estimate for 1927 for interest alone is $276,771 more than that of plaintiff's witness Mr. Sloan. There are sharp conflicts elsewhere in the evidence. For instance, Mr. Sloan assumed six months and Mr. Topping, defendants' witness, two months for the acquisition of the land. Plaintiff's witnesses Sloan and Robinson are not in accord as to the construction period for the buildings. This is no reflection on either, as they were giving their opinions, but it illustrates why, in the last analysis, it is important to have the judgment of the court

or master upon all relevant facts rather than the opinion of any one witness. This is especially true where an estimate is patently excessive or based upon unreasonable hypotheses. To quote again from the Minnesota Rate Case, supra: "The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture."

 Defendants' exceptions present other questions of going concern value, annual depreciation, per cent. condition of the property, depreciation reserve, and rate of return, but, after what has been said, and in view of the deficiencies in the evidence in some respects and the conflicts in others, it seems unnecessary to prolong this opinion further than to announce the conclusions which have been reached. The court is of the opinion that the material allegations of the bill have not been proven and that the exceptions to the master's report should be sustained, the report set aside, the interlocutory injunction dissolved, and the bill dismissed. An appropriate decree may be entered.