**SOUTHWESTERN BELL TELEPHONE CO.**
**v. CITY OF SAN ANTONIO, TEX.,**
**et al.**

**No. 7528.**

Circuit Court of Appeals, Fifth Circuit.

Feb. 25, 1935.

Rehearing Denied March 30, 1935.

James C. Henriques, of New Orleans, La., E. W. Clausen, of St. Louis, Mo., Wm. H. Duls and Nelson Phillips, both of Dallas, Tex., and E. D. Henry and L. M. Bickett, both of San Antonio, Tex., for appellant.

Bruce W. Teagarden, Carl Wright Johnson, and T. D. Cobbs, Jr., all of San Antonio, Tex., contra.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

The Southwestern Bell Telephone Company filed a bill against the city of San Antonio and its officials to restrain the enforcement of a scale of rates for telephone service within the city which had been established on June 20, 1918, for the company's predecessor by authority of the city, asserting that the scale had become confiscatory;

and to enjoin interference with a higher scale which the company had proposed to the city, and which, after a hearing, had been rejected. The answer denied confiscation, and asserted that the old rates were fair and reasonable and that the company's intimate connection with the American Telephone & Telegraph Company and with the Western Electric Company was causing losses which the San Antonio exchange ought not to bear; that the Southwestern Bell and all its properties, including that in other cities and other states, was prosperous and paying fair dividends; and that its business and property in San Antonio ought not to be segregated, but if it ought there was no confiscation. On April 23, 1928, after a hearing, the court held that confiscation was shown, and enjoined temporarily the enforcement of the old scale, requiring a bond to be given by the Southwestern Bell conditioned to repay all sums collected from its patrons in excess of the old scale if it should be held that the temporary injunction was improperly granted. Under this injunction and bond, the new scale has been charged to this date. The case was referred to a special master, and on March 1, 1930, he filed a comprehensive and detailed report upholding the company in its contentions that the old rates were confiscatory and the new rates necessary to avoid confiscation. Numerous exceptions were made by the city. The decision in the case of Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255, having appeared, the cause was re-referred to the master to take further evidence and make further report. The additional report was filed May 25, 1932, again upholding the contentions of the company. New exceptions covering 75 printed pages were filed by the city. The condensed record of the evidence covers about 3,300 pages. The court in an opinion which showed careful consideration of the case discussed many important questions of law and fact, but it was in no sense a finding of facts. (D. C.) 2 F. Supp. 611. A decree was signed March 20, 1933, from which this appeal is taken. The decree, after reciting some of the proceedings and referring to the opinion, proceeds to formulate in five numbered paragraphs the findings of the court. The first is that the suit was not prematurely brought. The second briefly finds that the master has committed error, and that his report should be set aside and held for naught. The third with equal brevity states that the court finds that the plaintiff "has failed to prove the material allega-tions of its bill of complaint, and that it has not been shown by satisfactory proof that the rates complained of and the ordinances upon which they are based are invalid or confiscatory." The fourth in fourteen subparagraphs points out several issues on which the plaintiff had the burden, which in the court's opinion it had not sufficiently carried, but there are no findings as to what the truth is about any issue, save that there is a qualified and tentative statement of a lump sum as the upper limit of value of property on which a return was to be earned for each year in question, and a finding that 6 per cent. was a nonconfiscatory rate of return. The fifth paragraph dissolves the temporary injunction and orders repayment of excess charges under the bond, and dismisses the bill, reserving administrative jurisdiction.

The effect of the decree is wholly to wipe out the detailed and specific report of the master, and to substitute what amounts to a general finding that the plaintiff has not proven its case. To review it, we should have to study in detail the whole of a record that it took months to make, just as though it had never been considered by a master or judge. We have nothing specific found but a rate of return. It cannot be that in more than 3,000 pages of evidence which enabled the master to make a finding on every point that nothing whatever was proven. The decree is on its face not in conformity with the Equity Rules. Rule 71 (28 USCA § 723) prescribes the general form of a decree, and prohibits putting in it anything but the effective decree or order. The findings of fact and conclusions of law required by the new rule 70½ (28 USCA § 723) are not to go into the decree, but are to "be entered of record." The very numbering of rule 70½ places it ahead of rule 71 which relates to the contents of the decree, and shows that it deals with something precedent. Whether the findings of fact are put in the decree or elsewhere is a mere matter of form, but that they shall be "special" and made "separately" from the conclusions of law is required by rule 70½, and these requirements are substantial. Neither has been met here. Cases may occur in which the evidence is insufficient as a matter of law to authorize a finding on some issue, but under the new rule there may not be a general negative finding, but there must be a special dealing with all questions and a separate stating of the facts which are found, and of the issues not found. The

degree of detail is a matter of judgment. Uncontested facts may be found with more generality. The contested ones should be put in such detail as will decide each contest made concerning them, the purpose of the rule being to aid review by enabling it to be restricted to the exact points on which error is claimed. In ascertaining whether there is confiscation under an imposed scale of rates we believe it to be always necessary to fix the value of the property used and useful in the service of the public; the amount of gross income received for its use; the items of expense of operation and of maintenance, and other deductions to be allowed; and the rate of return that will afford a fair compensation. These general items may involve many subcontests either of law or fact. They manifestly do in this case. The master's report upon them has been wholly discarded. A rate of return of 6 per cent. has been found, but all else has in effect been reduced to a general finding that the court is not convinced that there is confiscation. The case of Los Angeles Gas Corporation v. Railroad Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180, holds that where, as here, the court is not reviewing the legislative process of rate making, but is exercising the judicial function of ascertaining whether the legislative rate conflicts with the Constitution, it is concerned not so much with the way the rate was arrived at as with its actual operation and result. But this does not mean that the court can escape separate inquiry into the necessary elements of property used, income, expense, and fair return, or fail to make the special findings required by rule 70½. When the master's results are disapproved and discarded, there ought to be another reference or else a substitution of detailed findings by the court. If evidence is lacking to meet some view of the law entertained by the court, opportunity to produce it ought to be given. If after fair opportunity sufficient proof is not had, the precise issues not proven ought to be pointed out, with the reasons why the evidence produced is insufficient. The things that are established ought to be found, so that they may definitely appear on a review without a study of the whole record. The case must be returned to the trial court for more specific rulings on the exceptions to the master's report, or if the report shall continue to be entirely rejected, for another reference or for special substituted findings by the court.

However, from the court's opinion and decree and from the argument here, it is apparent that there are some questions of importance which we can now consider and thereby aid the further trial of the cause. It appears that in tracing the historical cost of the San Antonio exchange the books available begin in 1915 with entries which are not known to be actual costs but may have arisen from appraisals or other form of estimate. These are followed by the usual entries of additions and betterments and retirements from time to time, and the account has stood as the company's investment account. We do not think these old entries ought to be regarded as mere self-serving statements which have no evidential value, or that their presence invalidates the whole evidence as to historical cost. Public utility companies are required to keep such accounts, which are the basis of periodical sworn reports. They are open to inspection by rate-fixing bodies and they always figure in rate investigations. The rates here in question were established in 1918, three years after the questioned entries were made. The rate ordinance itself recites that the applicant had made a showing, that the city officials had employed experts to analyze the showing and conduct an independent investigation into the assets, liabilities, revenues, and expenses, and the capital entitled to a return in the city of San Antonio, and had thereupon granted the increase applied for. Almost certainly these questioned entries then came under review and stood uncorrected. Since 1915, the additions and betterments recorded approach in amount the whole present value of the property as tentatively found by the court, so that the values represented by the old entries must through depreciation and replacements have largely disappeared. Compare Los Angeles Gas Corporation v. Railroad Commission, 289 U. S. 287, at page 308, 53 S. Ct. 637, 77 L. Ed. 1180. There is in litigation like this a presumption of good faith and correctness attending the basic records required to be kept by a public service corporation. West Ohio Gas Co. v. Public Utilities Commission, 55 S. Ct. 316, 79 L. Ed. ——, decided January 7, 1935; Consolidated Gas Co. v. Newton (D. C.) 267 F. 231, at page 242; Newton v. Consolidated Gas Co., 258 U. S. 165, at page 176, 42 S. Ct. 264, 66 L. Ed. 538. The questioned entries, while irregular, are a part of the property accounts and have so stood for many years, until now proof of their exact origin has become unavail-

able. While the historical cost thus shown by the books is less satisfactory and complete than if every entry could be clearly explained and sustained, we think it evidence worthy to be received and weighed.

■ Another question to which far-reaching consequences have been attached arises out of the circumstance that the historical cost of the San Antonio exchange includes much equipment bought from the Western Electric Company, and that the estimates of reproduction cost are based partly on the prices quoted by that company. The Western Electric and Southwestern Bell are each practically owned and controlled by the American Telephone & Telegraph Company, though manned by different officials. The Western Electric has not a monopoly on telephone equipment such as it sells to the American Telephone & Telegraph Company and its subsidiaries, but it quotes them somewhat lower prices than it makes to independents and lower than the prices made by other manufacturers on similar equipment. This fact was held in Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 135, 51 S. Ct. 65, 75 L. Ed. 255, not to be conclusive that the Western Electric prices were fair and were not a by-pass for unjust profits to the American taken from the public by means of the telephone rates, and that there should be inquiry into that question. Such inquiry was made here by examination of the managing official for many years of the Western Electric and of its books. His testimony showed an average profit over fifteen years (at a low ebb at present) of around 5 per cent. over cost in the price of the equipment sold to the Bell Companies, and of 7 per cent. annually on his company's plant allocable to the Bell business. He also produced studies tending to show that these profits were less than were earned by a number of other large manufacturers. The Western Electric Company does a great deal of business beside that with the Bell Companies, and many estimates and allocations had to be resorted to in the effort to separate the Bell business. They seem to us to be in the main reasonable, and not to be considered as mere guesses. The handling of the cost of producing new patents seems subject to just criticism. The great general prosperity of the Western Electric Company as a whole is not a demonstration of excessive profits made from the Bell business or from the San Antonio exchange. A large cash dividend is explained as mainly a distribution of the proceeds of sale of two foreign subsidiaries, without connection with the Bell business; and the ownership of stock in other subsidiaries brings in large dividends. While not conclusive, the fact that Western Electric sells at slightly higher prices to independents who could buy elsewhere, and that competing manufacturers do not undersell, is powerful evidence that the prices made to the Bell Companies are not excessive. We do not intend to foreclose inquiry into the matter, for our examination of the evidence has been casual, but we are prepared to say that a failure to make mathematical demonstration of the exact cost and profit in the things bought from Western Electric ought not to exclude their cost from the investment account, nor Western Electric prices, which are the lowest available in the market, from being considered in estimating reproduction costs.

■ The Southwestern Bell not only owns and operates the San Antonio exchange whose rates are fixed by the officials of that city, but also toll lines leading to other cities within and without the state of Texas for which rates are fixed by other authorities. Generally speaking, the equipment in the city is used both for local and long distance telephoning, and the company's property from the switchboard outward is used wholly in the toll service. The separate rate regulation requires a separation of the property used in each business, with some fair apportionment of or some method of compensation for that used in both businesses, and with a corresponding disposition of revenues and expenses, so that neither business will bear unjustly the burdens of the other in fixing their respective rates. Exchanges and toll lines were at first separately owned, and the toll line owner paid the exchange owner a percentage of the tolls coming from messages originating within the exchange. When the toll line owner acquired the exchange, this division of tolls was often continued, the percentage paid from the tolls being charged as an expense in the accounting of the toll business, and as income in the accounting of the exchange, a sort of rental for the use of its equipment, the exchange bearing the whole expense of operating and maintaining its property. This plan provided a return to the exchange business proportioned with some degree of accuracy to the use made of its equipment by the toll business, and capable of being fixed at a figure fair to both businesses. It apparently is the simplest meth-

od of dealing with the situation, and was approved in City of Houston v. Southwestern Bell Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961. It may be noted, however, that under it a frequent use of the exchange for nearby calls might yield it less revenue than an infrequent use for distant and more costly calls. A fixed rate per call or per minute of use might have worked more accurately. In the present case, the Southwestern Bell contends that in making both its local and its toll rates the property beyond its switchboard has alone been considered as the basis for the toll rates, while the switchboard and all else within the city has been referred to the exchange business, so that the toll rates compensate it only for extra switchboard service, the intra switchboard service on all calls being considered local and paid for by the exchange rates, just as though instead of calling "long distance" a telegraph office had been called to send a telegram. It is said that this simple view of telephone service is now almost universally adopted. The city denies this, and contends that the plan ignores the fact that in long distance telephoning the subscriber or pay station user is actually connected through the exchange equipment with the toll line and uses the whole for a toll which is paid for the communication as a unit. This view involves as a consequence an apportionment of the entire exchange property, and of the expense of operating and maintaining it, between the local and the toll business according to the use made of it by each, the amount of use to be ascertained by counting calls or by a consideration of the time consumed in them. If the toll rate for the communication be fixed so as to cover the use of the exchange property so apportioned to the toll business, the owner will be compensated for the use of all his property when exchange rates are likewise fixed on a basis of the apportionment. But if one rate-making body apportions the exchange property together with its expense and maintenance and the other does not, the inconsistency may result in serious injustice. See West Ohio Gas Co. v. Public Utilities Commission, 55 S. Ct. 316, 79 L. Ed. ——. The required apportionment has many practical difficulties which might be mitigated by legislation or by conference and agreement among the rate-making bodies. In Smith v. Illinois Bell Telephone Co., 282 U. S. 133, at page 150, 51 S. Ct. 65, 75 L. Ed. 255, the subject was considered, but the court went no further than to say that by some practical method the different uses of the property should be recognized and the return properly attributable to each service should be ascertained. We learn in Lindheimer v. Illinois Telephone Co., 292 U. S. 151, at page 155, 54 S. Ct. 658, 78 L. Ed. 1182, that an allocation on the basis of use was afterwards reached in the trial court so satisfactory that no exception was taken, but the exact formula does not appear, and the Supreme Court passed no judgment on it. If, as we understand, there is no direct legislation on this point and no specific action by the rate-making bodies concerned, we think it was the managerial right of the company to initiate a mode of dealing with the situation, but subject to control by the rate-making bodies and subject to the criticism of the court. The master upheld the company's idea of a proper treatment. The District Judge disagrees. We believe it devolves on the trial court to ascertain and point out a practicable formula, if there be one, that is better than that suggested by the company, and to permit an adjustment of the case to it. This was half-heartedly attempted on the second reference by the master, but the court has rejected these results also. If an apportionment is practicable, the method of it ought to be settled and the proof adapted to it. If none is practicable, none ought to be demanded, and some mode of adjustment should be adopted similar to the toll percentage plan above mentioned. This long and expensive litigation ought not to be thrown away because the master and the court have differed as to the rule by which the case ought to be tried. The finding of a formula for an apportionment or the finding that none is practicable seems rather a question of fact to be settled in the first instance by the trial court than one of law which the reviewing court can or ought now to attempt to solve. Groesbeck v. Duluth, S. S. & A. R. Co., 250 U. S. 607, 608, 40 S. Ct. 38, 63 L. Ed. 1167.

■ Besides the problem of apportionment of the investment and expense of the San Antonio exchange as a whole between the local and toll businesses, it appears that recourse to apportionment was sought as to many items (whose exact nature and amount are not stated) within the exchange both touching its investments and expenses. These apportionments were rejected by the District Judge as too speculative, largely because there was no exact separate bookkeeping for the exchange. A separate accounting system for each local exchange

would be a great expense to it and of little value to its ordinary operation. Problems of allocation would be of daily occurrence instead of at the wide intervals of rate-making. Efficiency and economy seem to have dispensed with such bookkeeping in all large aggregated enterprises. Its absence has never been considered an insurmountable obstacle to investigations like the present, though allocation and apportionment must be more largely resorted to because of it. Compare Rowland v. Boyle and St. Louis & S. P. R. R. Co., 244 U. S. 106, at page 108, 37 S. Ct. 577, 61 L. Ed. 1022. Some things, as for instance the salaries in and equipment of the general offices, must always be apportioned by fair estimate. Investments and expenditures which occur in all units of a system, though track has not been kept of them in each unit, may likewise be distributed by fair apportionment. Where there is nothing extraordinary in the items, and it appears that all units have participated, a reasonable basis can be found for the distribution among them. A failure to trace each of the items into its unit will not defeat their consideration. Substantial and approximate correctness is enough where perfect accuracy is not attainable. Smith v. Ill. Bell. Tel. Co., 282 U. S. 133, at page 150, 51 S. Ct. 65, 75 L. Ed. 255. We do not mean to say that unreal and baseless apportionments are to be adopted because some witness testifies to them as proper, but that courts will not be deterred by difficulties from giving a reasonable recognition to all factors that go to make the truth of the situation. That allocation is made first to the business done within a state and then to the business of particular exchanges is not "piling inference on inference," but is rather division and then subdivision. If each step in the process is based on reason and probable truth, all may be successively taken. The ideal of seeing that all elements of investment and expense receive recognition somehow is complicated by the independent jurisdictions of several rate-making bodies, but it must be steadily pursued. By creating these jurisdictions, the law has increased the difficulties, and for that very reason the courts should be astute to solve them.

We are asked to affirm the case on the ground that a depreciation so excessive is claimed as that if it be disallowed no confiscation can be shown. Lindheimer v. Illinois Bell Telephone Co., supra. Since no finding whatever was made by the District Judge on the subject of depreciation, we will attempt none. The decree should be set aside and the cause remanded for further proceedings in conformity with this opinion, the temporary injunction entered in this suit and the accompanying bond increased to an amount to be fixed by the district court to be continued pending the further litigation.

It is so ordered.

On Petition for Rehearing.

PER CURIAM.

The petition for rehearing in the above numbered and entitled cause is denied.

The motion of appellant for modification is granted, and the District Court is required to make appropriate findings with reference to the operation of the rates in question for each year up to date of the decree. Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 136, 162, 51 S. Ct. 65, 75 L. Ed. 255.