UNITED STATES of America, Alaska Public Utilities Commission, and Office of Telecommunications of the Office of the Governor, State of Alaska, Petitioners,

v.

RCA ALASKA COMMUNICATIONS, INC., Respondent.

No. 3772.

Supreme Court of Alaska.

June 21, 1978.

On Rehearing May 18, 1979.

Alexander O. Bryner, U. S. Atty., Anchorage, for Department of Defense, United States of America, petitioner.

Timothy G. Middleton, Wohlforth & Flint, Anchorage, for Alaska Public Utilities Commission, petitioner.

B. Richard Edwards, Anchorage, and John W. Pettit, Hamel, Park, McCabe & Saunders, Washington, D.C., for Office of Telecommunications of the Office of the Governor, State of Alaska, petitioner.

Richard O. Gantz, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, and Donn T. Wonnell, Anchorage, for RCA Alaska Communications, Inc., respondent.

Lucinda J. McBurney and Margie Mac-Neille, Alaska Legal Services Corp., Anchorage, for Shirley Clubine, amicus curiae.

Hugh W. Fleischer, and Patrick L. Gileau, Anchorage, for Alaska Public Interest Research Group, amicus curiae.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, and BURKE, JJ.

## OPINION

RABINOWITZ, Justice.

This matter comes before the court on three separate petitions for review filed by the United States of America, the Office of Telecommunications of the Office of the Governor of the State of Alaska, and the Alaska Public Utilities Commission.

In June 1977, respondent RCA Alaska Communications, Inc. (RCAA) requested interim rate relief for its intrastate long distance telephone service by filing a tariff advice letter with the Alaska Public Utilities Commission (APUC). This requested interim rate relief, if granted, would result in an increase of 87% across the board in all existing intrastate long distance telephone rates and was calculated to yield $18,500,-000 annually in additional revenues. Extensive hearings on the requested interim rate increases were held in late August and early September 1977. In November 1977, the APUC entered an order denying RCAA's application for interim rate relief. On December 2, 1977, RCAA filed a tariff advice letter TA 112–981 requesting a permanent rate increase of 95% and an intrastate rate of return of 5.720%.

In its order denying the rate increase, the APUC concluded that the test enunciated in *Alaska Public Utilities Commission v. Greater Anchorage Area Borough*, 534 P.2d 549 (Alaska 1975), (hereinafter referred to as *APUC v. GAAB* or *GAAB*) is relevant to the resolution of preliminary injunction issues but that the *GAAB* test is not the standard the APUC will apply in deciding utility requests for interim rate relief.[1]

After the order of the APUC was entered, RCAA, in December 1977, filed an injunctive action in the superior court. A hearing was held on the same day as the suit for injunction was initiated. At the conclusion of the hearing, the superior court granted RCAA the injunctive relief it sought by entering a preliminary injunction, the effect of which authorizes RCAA to receive an 87% increase in its long distance toll rates within Alaska. The superior court's grant of injunctive relief in RCAA's favor was, in turn, stayed by Justice Burke, pending filing of petitions for review from the superior court's grant of injunctive relief.

In his formal order granting RCAA the injunctive relief, Judge Carlson made, in part, the following findings:

---

1. Despite this position, the APUC, in its decision, applied the *GAAB* analysis to the showing made by RCAA in support of its case for entering rate relief and concluded that "RCAA has failed to meet its burden of proof under the five point *GAAB* test and therefore is not entitled to interim rate relief. . . ." Order Denying Interim Rate Relief, Docket No. U–77–53, Order No. 2 at 13 (Alaska Pub.Util.Comm'n 1978).

That RCA Alascom has established sufficient cause for the issuance of a Temporary Restraining Order and a Preliminary Injunction and a Preliminary Injunction will issue. The Court finds that RCA Alascom has demonstrated a reasonable probability that a significant part of its projected intrastate expenses will be part of the final rate base for a permanent rate increase and under the applicable law the Alaska Public Utilities Commission was obligated to consider the intrastate return in determining whether the intrastate expenses of the company exceeded the intrastate revenues. The court finds that RCA Alascom has established a prima facie case that said expenses did exceed said revenues and that the intrastate rates of RCA Alascom result in a negative rate of return and are confiscatory. The court finds that the Commission acted unreasonably in completely denying RCA Alascom's requested rate increase for intrastate services.

The superior court, in its oral decision, granted RCAA interim relief and articulated the following factor which influenced its decision:

It's clear to me that the amount of expenses which RCA says it is incurring to provide intrastate service will in fact be part of its rate base when the final decision of the commission is made, whenever it is made. And therefore RCA is entitled to relief.[2]

Upon preliminary study and evaluation of the instant petitions for review, we decided to grant review and entered an order to that effect. In addition, this order provided:

The case is remanded to the Superior Court with directions to make detailed and explicit findings of fact and conclusions of law in accordance with the decision in *APUC v. GAAB*, 534 P.2d 549 (Alaska 1975). In making its findings and conclusions the Superior Court must consider the full record of the proceedings before the Alaska Public Utilities Commission.

The stay of the Superior Court's injunction entered by Justice Burke on December 19, 1977, remains in effect.[3]

After the matter was remanded to the superior court, the superior court considered the full record before the APUC and then filed additional findings of fact and conclusions of law. The overall legal conclusion of the superior court was that the APUC erred in ruling that "its scope of considerations was of the whole company's operations." In this regard, the superior court reasoned that revenue from RCAA's interstate ratepayers may not be used to subsidize services to intrastate ratepayers by virtue of "the regulations of the Commission and constitutionally."

Of the superior court's supplemental findings, the following are the most significant:

2. RCAA has adduced written evidence and oral testimony which shows that it has allocated its property costs, revenues, expenses, taxes and reserves in accordance with the principles and practices set forth in the February, 1971 edition of the Separations Manual published by the National Association of Regulatory Utility Commissioners. [*i. e.*, Ozark methodology]

3. RCAA has adduced written evidence and oral testimony which shows

---

**2.** In its oral opinion, the superior court further stated that the test it applies in these matters is as follows:

[p]rovided that other requirements are met, a preliminary injunction will be granted if the utility demonstrates a reasonable probability that the expenses on which its requested interim rate increase was based will be part of its final rate base.

Both in its oral decision and formal order, the court conditioned the granting of injunctive re-

lief upon RCAA's filing a bond in the amount of $20,000.

**3.** In response to respondent's petition for clarification, a further order was entered which noted:

It is not contemplated that additional briefing, on the part of the parties will be necessary, or that the record will be supplemented, except for the findings and conclusions requested under this court's order of February 28, 1978.

that for the two years ended December 31, 1976, it has sustained a net operating loss on its intrastate telephone utility operation of over $300,000 and $4,000,000 respectively.

. . . . .

8. The evidence before the Alaska Public Utilities Commissioner shows that if RCAA receives the full rate increase of 87% across the board on all of its intrastate services, RCAA will receive therefrom a rate of return on its intrastate rate base of less than 5%.[4]

Based, in part, on the foregoing, the superior court filed the following conclusions of law under which it had granted RCAA interim rate relief:

1. The adequacy of RCAA's current rates must be evaluated with reference to RCAA's allocated intrastate property costs, revenues, expenses, taxes and reserves and not with reference to RCAA's total company results of operation. Allocation of these rate-making items is properly accomplished, for this proceeding, only in accordance with the principles and practices set forth in the February, 1971 edition of the Separations Manual published by the National Association of Regulatory Utility Commissioners.

2. RCAA has made a serious and substantial showing that, on an allocated basis and with reference to its intrastate operations, expenses, and investment, its existing intrastate rates are confiscatorily low.

3. RCAA's existing rates will remain in effect for an unreasonably long period of time pending final Alaska Public Utilities Commission determination of proper permanent rates.

4. If an interim rate increase is not granted, RCAA will continue to suffer irreparable harm.

. . . . .

6. As the evidence stands on this record, to award RCAA a full interim increase of 87% across the board on all of its intrastate services will not enable RCAA to earn an excessively high rate of return on its intrastate operations.

7. RCAA has satisfied all the elements required in order to secure an interim rate increase. Accordingly, RCAA is entitled to its requested 87% across the board interim and refundable rate increase on intrastate services.

Concerning the question of protecting ratepayers of the interim rate increases it was ordering, the superior court, found:

7. There are several methods to protect the economic interests of those persons who would pay the increased rates if the permanent rate increase is less than the interim rate increase. The least expensive method and the method of refund most likely to reach the individuals and groups of ratepayers who may have paid refundable rates is for the Alaska Public Utilities Commission to order a reduction of rates from the permanent rates which are established for a period of time similar to the period over which the excess rates may have been collected sufficient for reimbursement.

In its conclusions of law, the superior court adopted the method set forth as a mechanism for refunding "excess revenues" in order to protect consumers paying the higher interim rates.[5]

4. The superior court also found:

5. To the best of the court's knowledge the Alaska Public Utilities Commission has not yet scheduled a date for the commencement of hearings on the permanent rate increase request which in any event will be more than six months in the future.

6. In the event interim rate relief is denied, Alaska law does not permit RCAA to recover in the future any revenues which the Alaska Public Utilities Commission may find in its final order on RCAA's permanent rate increase request that RCAA should have been entitled to collect.

. . . . .

9. The evidence before the Alaska Public Utilities Commission relating to the revenue requirements of RCAA on an intrastate basis and the issues raised by RCAA in its request for an interim rate increase cannot be characterized as frivolous or obviously without merit but are, in fact, serious and substantial.

5. In its conclusions of law, the superior court defined excess revenues as meaning:

In *APUC v. GAAB*, 534 P.2d 549 (Alaska 1975), we held that the following requirements must be met before the superior court can intervene and overrule or modify an order of the APUC affecting utility rates. First, the utility must make a serious and substantial showing that the existing rates are so low as to be confiscatory. Second, the utility is obligated to show that no date has been set by the Commission for a prompt final hearing, and that the existing confiscatory rates are likely to remain in force for an unreasonable period of time before the APUC makes its permanent rate determination. Third, the utility must convince the court that without the benefit of being permitted to operate under an interim rate increase, it will face irreparable harm. Fourth, the utility is required to demonstrate that if the interim rate relief is granted, the public can be adequately protected. Fifth, the utility must show that "serious" and "substantial" questions are involved in the rate case it has presented.[6]

■ The primary rationale for this court's remand for supplemental findings of fact and conclusions of law was our uncertainty, on the basis of the superior court's first oral decision and formal order, as to whether the superior court had considered the criteria of *APUC v. GAAB, supra,* in reaching its decision to grant RCAA the interim rate relief it requested. The second basis for our remand was our conclusion that it was inappropriate for the superior court to have issued injunctive relief without study of the record that was before the APUC.[7] Given the legal complexities involved in this case, as well as the difficult economic issues inherent in rate-making proceedings, we concluded that judicial intervention by way of injunctive relief was not appropriate unless study had been made first by the superior court of the relevant portions of the proceedings held before the APUC. To have permitted the original order to stand on the basis of the record the court had before it would have contravened the admonition which we issued in *APUC v. GAAB* against judicial rate-making. In this regard, it was said:

In general, a court in applying its equitable sanctions, must be most careful to avoid any semblance of judicial rate-making. . . . In cases such as the present one where an interim rate increase is being sought by a utility, there is the danger of a too frequent resort to the injunction by the superior courts which, in turn, might cause the administrative commission automatically to grant such increases (having been effectively deprived of any real discretion in the matter).[8] (footnote omitted)

In *APUC v. GAAB,* we further cautioned that our affirmance of the superior court's grant of injunctive relief to the utility was not "to be understood as a blanket endorsement of overruling decisions of the Commission denying interim rate increases."[9] Recognizing that generally rate-making decisions relate to complex subject matter which requires the particularized knowl-

---

revenues collected by RCAA under Alaska Public Utilities Commission rate authorization on an interim basis, whether in the aggregate or by class of customer or service, which exceed the rates that the Alaska Public Utilities Commission authorizes RCAA to collect in its final order in RCAA's permanent rate application.

6. In articulating these criteria in *APUC v. GAAB,* 534 P.2d 549, 554, 557 (Alaska 1975), we expanded upon the "balance of hardships" approach in *A. J. Industries v. Alaska Pub. Serv. Comm'n,* 470 P.2d 537, 540 (Alaska 1970), supplementing this approach with the criteria suggested in *Prendergast v. New York Teleph. Co.,* 262 U.S. 43, 49–50, 43 S.Ct. 466, 469, 67 L.Ed. 853, 858. This test is employed to determine the propriety of preliminary injunctive relief in cases "where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury." *A. J. Industries, Inc. v. APUC, supra,* quoted in *APUC v. GAAB, supra* at 554.

7. The superior court originally granted the preliminary injunction on the basis of two affidavits which were filed by officials of respondent, RCA Alascom.

8. *APUC v. GAAB,* 534 P.2d 549, 553 (Alaska 1975).

9. *Id.* at 558.

edge and experience of the rate-making body, we concluded that the appropriate standard of review is normally whether the administrative body had a reasonable basis for its decision.[10]

In *APUC v. GAAB*, we further stated that where the utility has made a substantial showing that existing rates are confiscatory, then an administrative decision which results in a prolonged continuation of such rates will rarely be found to have a rational basis:

It is at this juncture that the balance of hardships approach outlined in *A. J. Industries, Inc.* comes into play. We recognize that the balancing of hardships will almost invariably favor the utilities' position in situations such as are presented here, and it therefore should be only the beginning of the court's analysis. Thus, the primary limitations on the superior court's discretion must be found in the third aspect of the *A. J. Industries, Inc.* test and in the additional considerations discussed in *Prendergast*. Whether or not a preliminary injunction will be proper must turn on whether a 'serious' and 'substantial' showing that the rate is confiscatory has been made. If the party is seeking relief from an interim rate order, it must further be shown that these interim rates are to remain in effect for an unreasonable period pending final determination.[11]

Analysis of the superior court's supplemental findings of fact and conclusions of law reveals that the question of the appropriateness of granting judicial relief from the APUC's denial of interim rate relief was reached upon consideration of the salient factors articulated in *APUC v. GAAB* and upon consideration of the record made before the administrative agency. Thus, for the following reasons we affirm, in its major outlines, the superior court's grant of injunctive relief to RCAA.

The statutory framework for rate-making by the APUC appears in Title 42 of the Alaska Statutes. The general powers and duties of the commission are described in AS 42.05.141 which provides, in part:

The Alaska Public Utilities Commission may

.    .    .    .    .

(2) investigate  .  .  .  the rates .   .   . of a public utility and hold hearings on them; [and]

(3) make or require just, fair and reasonable rates  .  .  .  for a public utility;  .  .  . .

In addition, AS 42.05.151 provides:

(a) The commission may adopt regulations, not inconsistent with the law, necessary or proper to exercise its powers and to perform its duties under this chapter.

(b) The commission shall adopt regulations governing practice and procedure, consistent with due process of law, including the conduct of formal and informal investigations, pre-hearing conferences, hearings and proceedings .  .  .[12]

Of particular interest in the case at bar are those statutory provisions which address APUC's authority in relation to new or revised rates. AS 42.05.421 authorizes the APUC to suspend operation of new or re-

---

**10.** *Id.* at 558–59.

**11.** *Id.* at 559.

**12.** Another section, AS 42.05.161(b), expressly includes APUC regulations within the coverage of the Administrative Procedure Act.

With regard to the permissible range of utility rates, AS 42.05.381 requires that all rates shall be "just and reasonable." AS 42.05.371 further provides, in part:

The terms and conditions under which every public utility offers its services and facilities to the public shall be governed strictly by the provisions of its currently effective tariffs. No legally filed and effective tariff rate, charge, toll, rental, rule, regulation or condition of service shall be changed except in the manner provided in this chapter.

In addition, AS 42.05.391(a) prohibits utilities from granting an "unreasonable preference or advantage" to any customer or from subjecting a customer to an "unreasonable prejudice or disadvantage;" the section further states, "No public utility may establish or maintain an unreasonable difference as to rates, either as between localities or between classes of service."

vised rates for an initial period of no longer than six months; before the end of the suspension period, the commission is required to hold a hearing and to issue its order on the suspended tariff. In addition, the statute gives the APUC power to require escrow deposits for refund purposes; the burden of proving the reasonableness of a proposed tariff change is placed on the party initiating the change.[13] AS 42.05.431 further authorizes the commission to determine and order "a just and reasonable rate" when it has found upon investigation and hearing that a rate "demanded . . . for a service, subject to the jurisdiction of the commission . . . is unjust, unreasonable, unduly discriminatory or preferential."[14] Finally, AS 42.05.441 provides guidelines for valuation of utility property;

in part, the section states, "The commission may, after providing reasonable notice and opportunity to be heard, ascertain and set the fair value of the whole or any part of the property of a public utility, insofar as it is material to the exercise of the jurisdiction of the commission."

The utility is required to file any tariff revision in the manner provided by AS 42.-05.361.[15] That section states that the filing is to occur "[u]nder such regulations as the commission shall prescribe;" in addition:

The commission may reject the filing of all or part of a tariff which does not comply with the form of filing regulations of the commission or which is not consistent with this chapter or the regulations of the commission. A tariff or provision so rejected is void.[16]

---

13. The full text of AS 42.05.421 reads:

(a) When a tariff filing is made containing a new or revised rate, classification, rule, regulation, practice, or condition of service the commission may, either upon written complaint or upon its own motion, after reasonable notice, conduct a hearing to determine the reasonableness and propriety of the filing. Pending such a hearing the commission may, by order stating the reasons for its action, suspend the operation of the tariff filing for an initial period not longer than six months beyond the time when it would otherwise go into effect.

(b) An order suspending a tariff filing may be vacated if, after investigation, the commission finds that it is in all respects proper. Otherwise the commission shall hold a hearing on the suspended filing and issue its order, before the end of the suspension period, granting, denying or modifying the suspended tariff in whole or in part.

(c) In the case of a proposed increased rate, the commission may by order require the interested public utility or utilities to place in escrow in a financial institution approved by the commission and keep accurate account of all amounts received by reason of the increase, specifying by whom and in whose behalf the amounts are paid. Upon completion of the hearing and decision the commission may by order require the public utility to refund to the persons in whose behalf the amounts were paid, that portion of the increased rates which was found to be unreasonable or unlawful. No funds shall be released from escrow without the commission's prior written consent and the escrow agent shall be so instructed by the utility, in writing, with a copy to the commission. The

utility may, at its expense, substitute a bond in lieu of the escrow requirement.

(d) One who initiates a change in existing tariffs shall bear the burden to prove the reasonableness of the change.

14. AS 42.05.431 reads:

*Power of commission to fix rates.* When the commission, after an investigation and hearing, finds that a rate demanded, observed, charged or collected by a public utility for a service, subject to the jurisdiction of the commission, or that a classification, rule, regulation, practice, or contract affecting the rate, is unjust, unreasonable, unduly discriminatory or preferential, the commission shall determine a just and reasonable rate, classification, rule, regulation, practice, or contract to be observed or allowed and shall establish it by order. A municipality may covenant with bond purchasers regarding rates of a municipally owned utility, and the covenant is valid and enforceable and is considered to be a contract with the holders from time to time of the bonds.

15. AS 42.05.411(b).

16. AS 42.05.361(c). The other sections of AS 42.05.361 provide:

(a) Under such regulations as the commission shall prescribe, every public utility shall file with the commission, within such time and in such form as the commission shall designate, its complete tariff showing all rates, including joint rates, tolls, rentals, and charges collected and all classifications, rules, regulations, and terms and conditions under which it furnishes its services and facilities to the general public, or to a regulated or municipally owned utility for resale to the

Pursuant to this detailed statutory power to regulate rates, the APUC has promulgated regulations concerning utility tariff practice and procedure, including 3 AAC 48.430 which provides:

*Jurisdictional Separations.* The February 1971 edition of the Separations Manual (standard procedure for separating telephone property cost, revenues, expenses, taxes, and reserves) published by the National Association of Regulatory Utility Commissioners is hereby adopted by reference. The property costs, revenues, expenses, taxes, and reserves of each telephone utility certificated by the commission shall be allocated pursuant to the principles and procedures set forth in the manual. This manual shall be used to determine those property costs, revenues, expenses, taxes, and reserves that are subject to the jurisdiction of the commission.

The APUC argues that 3 AAC 48.430 requires jurisdictional separations for information purposes only. RCAA argues that the commission required the separation of RCAA's intrastate and interstate operations and that 3 AAC 48.430 required RCAA to use procedures found in the 1971 National Association of Regulatory Utility Commissioners (NARUC) Separations Manual (termed the "Ozark" methodology).

A previous RCAA application for interim rate relief (filed December 31, 1975) was denied by APUC because RCAA had failed "to comply with the filing regulations of the Commission" and because RCAA's tariff advice letter was inconsistent with AS 42.05 and 3 AAC 48. More specifically, the commission explained:

RCA Alascom has failed to comply with AS 42.05 and 3 AAC 48.275(a)(1)(2)(3)(4)(9)(11) and (12) in that it has only filed exhibits showing total company results. The Commission agrees with RCA Alascom that the Commission may look only at the intrastate figures when setting rates for RCA Alascom intrastate service. . . . Without intrastate figures stated separately from interstate figures the purposes of AS 42.05 and 3 AAC 48.275 cannot be realized. . . . When RCA Alascom refiles this rate request it shall only file intrastate computations for each requirement of AS 42.05 and 3 AAC 48.275. The method of arriving at the intrastate figures shall also be described.[17]

At the date of the APUC's order, 3 AAC 48.430 already had been promulgated. The APUC did not refer to 3 AAC 48.430 in its order rejecting the proposed interim increase. Indeed, the order expressly contemplated that RCAA would "describe" the separations methodology when its rate request was refiled—thus leaving the way open for a non-Ozark formula. The language of 3 AAC 48.430 does not address specifically the interstate/intrastate separations problem; and the regulation is phrased so as to apply to toll settlements[18]

---

public, together with a copy of every special contract with customers which in any way affects or relates to the serving utility's rates, tolls, charges, rentals, classifications, services or facilities. The public utility shall clearly print, or type, its complete tariff and keep an up-to-date copy of it on file at its principal business office and at a designated place in each community served. The tariffs shall be made available to, and subject to inspection by, the general public on demand.
  (b) The tariffs of a public utility which are also subject to the jurisdiction of a federal regulatory body shall correspond, so far as practicable, to the form of those prescribed by the federal regulatory body.

**17.** In this order, the APUC further explained:
  The Commission concurs with the staff position that a schedule of separate intrastate

plant together with depreciation thereon is necessary to properly evaluate the depreciation expense to be included in the pro forma revenue requirement for the intrastate portion of the company's business.

  .    .    .    .    .

  The rate base of the intrastate operations of RCA Alascom is necessary to verify that it is not receiving under test year conditions a reasonable rate of return on its intrastate investment. The intrastate rate base calculation is also helpful in computing depreciation expenses on the portion of plant used for intrastate service.

**18.** This inference is strengthened somewhat by the agency's reliance upon AS 42.05.401(a) as one source of authority for 3 AAC 48.430. AS 42.05.401(a) provides for apportionment of joint rates among utilities.

between telephone utilities operating within Alaska, *i. e.*, not expressly for interstate/intrastate separations. These circumstances are consistent with the APUC position that the Ozark methodology has never been the methodology used by the APUC in separating interstate and intrastate operations and that 3 AAC 48.430 requires jurisdictional separations for information purposes only.

Despite this plausible support for the position of APUC, the language of 3 AAC 48.430 appears mandatory. Specifically, the regulation purports to adopt by reference the NARUC Separations Manual; and the final sentence of 3 AAC 48.430 contains a directive which is particularly well-suited to the separations problem in the case at bar:

> This manual shall be used to determine those property costs, revenues, expenses, taxes, and reserves that are subject to the jurisdiction of the commission.

The mandatory nature of 3 AAC 48.430 is underscored by AS 42.05.541 which provides, "Regulations adopted and issued by the commission in accordance with this chapter have the effect of law." As noted previously, AS 42.05.361(c) permits rejection of any tariff filing which is not consistent with APUC regulations; such a rejection makes the tariff filing void.[19]

In general, an administrative agency must comply with its own regulations.[20] In *Jager v. State*, 537 P.2d 1100, 1108 (Alaska 1978), we said, "One indication whether an agency has proceeded in the manner required by law is compliance with its own regulations." Here, however, the APUC argues that it has complied because a proper interpretation of 3 AAC 48.430 requires jurisdictional separations for the APUC's information only. Although an administrative agency's interpretation of its own rules is entitled to great weight,[21] the ultimate resolution of a regulation's meaning is a question for the courts.[22]

Although the APUC's interpretation of 3 AAC 48.430 is not barred by its previous RCAA rate order or by other facts in the instant case, we think the APUC's view of the questioned regulation is overly strained in light of the compulsory language of 3 AAC 48.430 and the detailed rate-making process contemplated by Title 42. In our view, the APUC's interpretation is contrary to the plain meaning of the regulation, particularly when viewed in the context of the APUC's order denying interim rate relief for failure on RCAA's part to provide jurisdictional separations. We thus conclude that the current interpretation of 3 AAC

---

**19.** We note, however, that the APUC's denial of RCAA's earlier interim rate increase was not based upon failure to comply with 3 AAC 48.-430. In addition, 3 AAC 48.310 provides for possible rejection of a tariff filing when such filing is not consistent with sections 200 through 420 only. Thus, the regulations do not make 3 AAC 48.430 an express basis for rejection. However, 3 AAC 48.200 includes sections 200 through 430 as regulations which "cover the construction, filing, posting and publication of utility tariffs including special contracts."

In addition, 3 AAC 48.210 provides for waiver of any requirement appearing in sections 200 through 430 "by order of the commission upon application and a showing." The brief of the Alaska Public Interest Research Group which was filed in the proceeding before the APUC indicates that AkPIRG filed a "Petition for Waiver of Regulation" seeking to have the provisions of 3 AAC 48.430 waived. No disposition of this waiver request appears among the orders of the commission in this matter.

**20.** *Service v. Dulles*, 354 U.S. 363, 388–89, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403, 1418 (1957), relying on *Accardi v. Shaughnessy*, 347 U.S.

260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) ("*Accardi I*"); *Nader v. Bork*, 366 F.Supp. 104, 108 (D.D.C.1973); 3 Menzies, Stein, Gruff, Administrative Law § 14.01, 14–9 through 14–11 (1977); *see generally* 1 F. Cooper, State Administrative Law 270–72 (1965).

**21.** *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965); *Burglin v. Morton*, 527 F.2d 486, 490 (9th Cir.), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976); *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967); *Washington State Liquor Control Board v. Washington State Personnel Board*, 88 Wash.2d 368, 561 P.2d 195, 201 (1977).

**22.** *See Culligan Water Conditioning of Bellflower, Inc. v. State Bd. of Equalization*, 17 Cal.3d 86, 130 Cal.Rptr. 321, 324, 550 P.2d 593, 596 (1976); *Carmona v. Division of Industrial Safety*, 13 Cal.3d 303, 118 Cal.Rptr. 473, 478, 530 P.2d 161, 165–66 (1975); 4 K. Davis, Administrative Law Treatise § 30.12, at 258–62 (1958).

48.430 by the APUC constitutes, in the case at bar, an unreasonable, retroactive modification of the regulation.[23] The plain meaning of 3 AAC 48.430 and its mandatory character indicate that the Ozark method of jurisdictional separations was required to be followed by the APUC in the case at bar.[24]

■ Thus, we affirm the superior court's ruling that the APUC erred in considering the whole of RCAA's operations in its determination of whether interim rate relief should be granted.[25] In short, we hold that the APUC was required to accept RCAA's separations data based upon the February 1971 edition of the Separations Manual published by the National Association of Regulatory Utility Commissioners (the Ozark methodology). Although the APUC is not required by statute to adopt the Ozark separations procedure, the APUC, as we have held, is bound to follow its own regulations, and 3 AAC 48.430, without limitation, requires separations to be based upon the Ozark methodology.

Inherent in the foregoing is our conclusion that separation of intrastate and interstate properties, expenses, and revenues is required for properly determining the adequacy of RCAA's intrastate rates.[26] Separation of intrastate and interstate operations has been required by the United States Supreme Court for two related reasons: (1) to avoid jurisdictional conflicts between state and federal regulatory agencies and (2) to avoid discriminatory rates which result in one class of ratepayers subsidizing another.

The United States Supreme Court provided some guidance regarding intrastate and interstate separations requirements in *Smith v. Illinois Bell Telephone Co.*, 282

U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). In *Smith v. Illinois Bell*, the Illinois Commerce Commission appealed from a district court decree enjoining enforcement of the commission's order which prescribed rates for telephone service in Chicago. The district court determined that the ordered rate reduction was confiscatory and a violation of 14th Amendment due process. The commission had found that the rates in effect prior to its reduction order would produce an excessive return upon the rate base as calculated by the commission. In part, the district court concluded that the commission's rate base valuation was incorrect and that a proper calculation of property value and expenses indicated that the return to the telephone company would be so inadequate as to be confiscatory.

The Supreme Court noted that neither the commission nor the district court had distinguished between intrastate and interstate property and business of Illinois Bell. Although the company had introduced evidence separating the intrastate and interstate business, the district court determined the issue on the basis of the telephone company's total Chicago property. The Court remanded, in part, for findings as to the intrastate side of Illinois Bell's business and explained:

> The separation of the intrastate and interstate property, revenues and expenses of the company is important not simply as a theoretical allocation to two branches of the business. It is essential to the appropriate recognition of the competent governmental authority in each field of regulation. In disregarding the distinction between the interstate and intrastate

**23.** In *Hootch v. Alaska State-Operated School System*, 536 P.2d 793, 806 (Alaska 1975), this court stated that an administrative agency may modify or repeal its regulations so long as such action is neither arbitrary nor unreasonable. In the case at bar, however, no suggestion of an amendatory process appears. *See generally Kelly v. United States Dept. of Interior*, 339 F.Supp. 1095, 1100–02 (E.D.Cal.1972). Thus, we deem the APUC's interpretation ("for information only") a modification that is unreasonable and arbitrary because of the absence of

compliance with statutory rule-making procedures. *Id.*

**24.** Through appropriately promulgated regulations, it is open to the APUC to require the Ozark separations for informational purposes.

**25.** See conclusion of law number 1 which we have quoted previously in the text at page 7.

**26.** This issue presented the primary question of law which was raised in these petitions.

business of the company, the court found it necessary to pass upon the fairness of the division of interstate tolls between the American [Telephone and Telegraph] and Illinois [Bell Telephone] companies. . . .[27]

But the interstate tolls are the rates applicable to interstate commerce, and neither these interstate rates nor the division of the revenue arising from interstate rates was a matter for the determination either of the Illinois Commission or of the court in dealing with the order of that Commission. The Commission would have had no authority to impose intrastate rates, if as such they would be confiscatory, on the theory that the interstate review of the company was too small and could be increased to make good the loss. The interstate service of the Illinois Company, as well as that of the American Company, is subject to the jurisdiction of the Interstate Commerce Commission . . .. The proper regu-

lation of rates can be had only by maintaining the limits of state and federal jurisdiction, and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed.[28] (citations omitted)

The portion of the district court's opinion which the Supreme Court rejected in *Smith v. Illinois Bell* was addressed to the contractual division of interstate tolls between AT&T and Illinois Bell. The lower court did not attempt to modify the division or the interstate rate upon which it was based. In the case at bar,[29] the APUC did not evaluate the fairness of interstate toll settlements between RCAA and AT&T.[30]

**27.** Interstate telephone service was provided under an agreement between the Illinois Bell Telephone Company and the American Telephone and Telegraph Company. AT&T also owned approximately 99% of the stock of Illinois Bell. *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 143, 51 S.Ct. 65, 66, 75 L.Ed. 255, 260 (1930). Throughout the opinion, the Court refers to Illinois Bell and AT&T as the Illinois and American companies respectively.

**28.** 282 U.S. at 148–49, 51 S.Ct. at 68–69, 75 L.Ed. at 263. The three judge district court decision which the Supreme Court set aside in *Smith* is found in *Illinois Bell Telephone Co. v. Moynihan*, 38 F.2d 77 (N.D.Ill.1930). There the district court concluded that the issue of confiscation could be determined on the basis of Illinois Bell's total Chicago property; thus, no separation of exchange facilities used in connection with interstate service within the city was necessary. The court thought a separation was unnecessary because (1) the total property basis was less favorable than separated bases to the company in its challenge to the commission's order, (2) a separation would not affect the result (*i. e.*, interstate activity was a small percentage of the company's total operation in Chicago and an injunction would be required under either an intrastate or total business calculation), and (3) a total company basis was more convenient since the commission had proceeded in that manner. The court specifically approved Illinois Bell's separation method—under which no allocation of exchange property

between intrastate and interstate operations had been made. The district court then went on to evaluate the fairness of the interstate toll settlement between Illinois Bell and American Telephone and Telegraph:

> If the interstate business of the Illinois Company is excluded in determining the issue of confiscation, it is not necessary, obviously, to consider the question of the division of interstate tolls. If the issue of confiscation is to be determined upon a consideration of the entire Chicago business of the Illinois Company, we should examine the objections made to the division of interstate tolls.

38 F.2d at 83. The toll-splitting arrangement was scrutinized and determined to be fair and reasonable.

**29.** In providing interstate telephone service, RCAA connects with the AT&T system; interstate tolls are divided between the interstate (AT&T) and intrastate (RCAA) carriers.

**30.** Petitioners suggest that the settlement contract is not an interstate rate established by the Federal Communications Commission but rather an agreement negotiated independently between RCAA and AT&T. In our opinion, this argument is irrelevant to the question whether an intrastate separation is required—as it was in *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). However, the nature of the settlement may be relevant to a determination of what separations methodologies are appropriate.

However, the APUC determination—that total operations of RCAA established nonconfiscation regardless of the adequacy of the intrastate return—reflects the APUC's implicit conclusion that RCAA's interstate settlement had produced a surplus with which to offset any shortfall in the intrastate return. Although less direct than the district court's evaluation of interstate toll settlements in *Smith*, the APUC position appears to be the kind of jurisdictional mixing with which the Supreme Court was concerned in *Smith v. Illinois Bell Telephone Co., supra.*

After the district court had made new findings and had entered a final decree permanently restraining enforcement of the commission's order and releasing Illinois Bell from any obligation to refund money collected during the pendency of the suit, the case was again before the Supreme Court in *Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934). *In Lindheimer v. Illinois Bell,* no question was raised by the parties as to the adequacy of the district court's allocation of property and expenses to the intrastate and interstate sides of the business. However, the assignment of certain revenues to the interstate, instead of the intrastate, business was challenged and the various component parts of the company's revenue production were argued.

In evaluating the effect of the district court's decision and of the findings upon which its decision was based, the Supreme Court in *Lindheimer v. Illinois Bell* examined the net intrastate income in Chicago under existing rates (prior to the commission's rate reduction order) as shown by (1) the company's statement from its books, and (2) the district court's adjustments. These two net intrastate income figures were compared with the amount of net income which would be necessary to avoid confiscation under the district court's findings of fair value, income, expenses and

rate of return. As the Court observed, such a comparison indicated that, on the basis of the district court's findings, when the commission's rate reduction order was made, "not only the new rates, but the existing rates as well were grossly confiscatory." [31] In succeeding years as well, "the inference would be irresistible that the existing rates were confiscatory when they were prescribed . . . ." [32] However, the Court noted the company's assertion in the rate proceeding that the existing rates were just and reasonable; and Illinois Bell had not sought to enjoin the previous rates when it brought suit to prevent enforcement of the new rates. The Court also stated:

> The financial history of the Illinois Company repels the suggestion that during all these years it was suffering from confiscatory rates.[33]

In support of this statement, the Court cited various aspects of Illinois Bell's financial condition and acknowledged:

> We do not lose sight of the fact that this showing embraces the entire business of the Illinois Company, both interstate and intrastate.[34]

However, the Court observed that intrastate factors also illustrated the robust financial condition of Illinois Bell prior to the commission's rate reduction order. In light of these considerations, the Court concluded that the district court's findings were not an adequate basis for decision:

> This actual experience of the [Illinois] company is more convincing than tabulations of estimates. In the face of that experience, we are unable to conclude that the company has been operating under confiscatory intrastate rates. Yet, as we have said, the conclusion that the existing rates have been confiscatory— and grossly confiscatory—would be inescapable if the findings below were accepted. In that event, the company would not only be entitled to resist reduc-

---

31. *Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 161, 54 S.Ct. 658, 662, 78 L.Ed. 1182, 1190 (1934).

32. *Id.*

33. 292 U.S. at 162, 54 S.Ct. at 661, 78 L.Ed. at 1190.

34. *Id.*

tion through the rates in suit, but to demand, as a constitutional right, a large increase over the rates which have enabled it to operate with outstanding success. Elaborate calculations which are at war with realities are of no avail. The glaring incongruity between the effect of the findings below as to the amounts of return that must be available in order to avoid confiscation and the actual results of the company's business makes it impossible to accept those findings as a basis of decision.[35]

The Court then proceeded to limit its inquiry to "[t]he effect of the reduction in net income by the rates in suit." [36]

The APUC has relied throughout these proceedings upon *Lindheimer v. Illinois Bell* as authority for its consideration of RCAA's total telephone business rather than merely its intrastate operations. As we read the case, however, the Supreme Court of the United States did not move away from its position that separation of intrastate and interstate business is necessary in order to assess the adequacy of intrastate rates. Although the use of the total company financial posture may be somewhat inconsistent with the Court's language in *Smith v. Illinois Bell,* the Court's purpose apparently was to illustrate the absurd results which were implied by the district court's findings. In our view, one problem with the Supreme Court's approach is that total company financial health is still an ambiguous indicator of whether Illinois Bell's intrastate rates were adequate. That is, the company's excellent financial condition

could have resulted from a surplus in interstate return—despite inadequate intrastate rates. The Court's discussion minimizes this possibility by noting that the bulk of Illinois Bell's business during the period prior to the rate reduction order was derived from intrastate activity. Thus, although the *Smith* and *Lindheimer* cases are not entirely consistent, the Supreme Court nowhere suggests that intrastate rate determinations may take into account the combined intrastate and interstate business of the telephone company; nor does the Court in *Lindheimer* suggest that its position in *Smith v. Illinois Bell* was modified.

Some courts have viewed *Smith v. Illinois Bell* as establishing a strict separations requirement.[37] However, in other utility contexts, the Supreme Court has suggested that some flexibility may be permissible.

In *Lone Star Gas Co. v. Texas,* 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304 (1938), the Texas Railroad Commission had sued to enforce its order setting rates for domestic gas. Although the gas company had property and operations in Oklahoma, the commission treated the company's property as an integrated system in prescribing a rate for gas delivered in Texas. The Supreme Court first held that no commerce clause violation had occurred, in part, because the commission had not attempted to set rates for gas delivered in Oklahoma and had not impinged on Oklahoma's jurisdiction. Chief Justice Hughes' opinion then considered the question whether Lone Star Gas was required to segregate interstate and intra-

---

**35.** 292 U.S. at 163–64, 54 S.Ct. at 663, 78 L.Ed. at 1191.

**36.** 292 U.S. at 164, 54 S.Ct. at 663, 78 L.Ed. at 1191. Since the existing rates could not be regarded as inadequate, "[t]he question is whether the Company has established . . . that this reduction would bring about confiscation." *Id.*

**37.** *See, e.g., State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 532 (Tex.1975); *see also South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n,* 352 So.2d 964, 981–82 (La. 1977); *Pacific Tel. & Tel. Co. v. Hill,* 229 Or. 437, 365 P.2d 1021, 1024 (1961); *Bell Tel. Co. v. Public Serv. Comm'n,* 70 Nev. 25, 253 P.2d 602, 610–13 (1953). Numerous public utility regula-

tory commissions have also concluded that jurisdictional limits require a separation between intrastate and interstate operations. *See, e.g., Re General Tel. Co. of Cal.,* 80 P.U.R.3d 2, 49 (Cal. Pub. Util. Comm'n 1969); *Re Pacific Tel. & Tel. Co.* 77 P.U.R.3d 1 (Cal. Pub. Util. Comm'n 1968); *Re Jamestown Tel. Corp.,* 11 P.U.R.4th 55, 61 (N.Y. Pub. Serv. Comm'n 1975); *Pennsylvania P.U.C. v. Bell Tel. Co. of Pa.,* 16 P.U.R.3d 207, 231 (Pa. Pub. Util. Comm'n 1956); *Re Southern Bell Tel. & Tel. Co.,* 3 P.U.R.4th 406, 409 (S.C. Pub. Serv. Comm'n 1973); *Re the Mountain States Tel. & Tel. Co.,* 78 P.U.R.3d 429, 434–35 (Utah Pub. Serv. Comm'n 1969).

state properties and business in order to bear its burden of proving that the rate was confiscatory, unreasonable or unjust. The Court concluded that the gas company could not be required to separate its intrastate and interstate operations when the commission had based its rate determination on system-wide operations. The Court explained, in part:

This was not a case where the segregation of properties and business was essential in order to confine the exercise of state power to its own proper province. Compare *Smith v. Illinois Bell Telephone Company*, 282 U.S. 133, 148, 149, 51 S.Ct. 65, 68, 69, 75 L.Ed. 255, [262, 263]. Here, as we have seen, the Commission in its method of dealing with the property and business of appellant as an integrated operating system did not transcend the limits of the state's jurisdiction or apply an improper criterion in its determinations. But if in the circumstances shown the Commission was entitled to make its findings with respect to appellant's property and business upon the basis it adopted in order to fix a fair rate for the sales and deliveries in Texas, appellant was entitled to assail those findings upon the same basis.[38]

The Court's treatment of these issues is significant because the opinion seems to view the jurisdictional limits of *Smith v. Illinois Bell* as providing a fairly insignificant barrier to the consideration by a state commission of integrated operations of the utility.[39]

In *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), the Supreme Court rejected an attack on a Federal Power Commission (FPC) order reducing certain interstate wholesale natural gas rates. The case involved a production company and pipeline company which were organized separately but operated as a single enterprise. Together, the companies' operations served three sets of purposes: intrastate

transportation and sale in Texas, interstate transportation and sale to industrial consumers, and interstate transportation and sale to distributors for resale. The FPC had jurisdiction over only a portion of these activities; but in determining the interstate wholesale rate, the FPC did not separate the property used in operations over which it had jurisdiction. Instead, the FPC attempted to achieve the same thing by allocating costs to three classes. The gas company objected to the FPC method, contending that its direct industrial sales were being burdened with the costs of a part of the system which were not used in that portion of the business. The Court concluded that the FPC method of allocating costs for rate-making purposes was not precluded by the FPC's grant of administrative authority; writing for four members of the Court, Justice Douglas explained:

The function which an allocation of costs (including return) is designed to perform in a rate case of this character is clear. The amount of gross revenue from each class of business is known. Some of those revenues are derived from sales at rates which the Commission has no power to fix. The other part of the gross revenues comes from the interstate wholesale rates which are under the Commission's jurisdiction. The problem is to allocate to each class of the business its fair share of the costs. It is of course immaterial that the revenues from the intrastate sales or the direct industrial sales may exceed their costs, since the authority to regulate those phases of the business is lacking. To the extent, however, that the revenues from the interstate wholesale business exceed the costs allocable to that phase of the business, the interstate wholesale rates are excessive. . . .

The Commission did not include in the rate reductions which it ordered any of the excess revenues over costs from the unregulated business. The reductions or-

---

**38.** *Lone Star Gas Co. v. Texas*, 304 U.S. 224, 241, 58 S.Ct. 883, 891, 82 L.Ed. 1304, 1316 (1938).

**39.** *See also Illinois Commerce Commission v. United States*, 292 U.S. 474, 54 S.Ct. 783, 78 L.Ed. 1371 (1934).

dered were measured solely by the excess revenues over costs in the regulated business . . . .[40]

As we read these later cases, the Supreme Court has indicated that the jurisdictional concerns articulated in *Smith v. Illinois Bell Telephone* are not an absolute bar to considering total company operations in setting rates. This flexibility appears most likely to be invoked when (1) the utility is a highly complex, fully integrated enterprise, (2) the agency avoids evaluating the rates which are not within its jurisdiction, and (3) the agency uses a rational approach to allocating costs, etc. to the regulable side of the business (in the absence of a separations methodology). However, the jurisdiction/preemption thread running through these opinions is supplemented by a separate line of reasoning which provides another basis for requiring a separation—the need to avoid rate discrimination through hidden subsidies of some ratepayers by others.

In regard to this latter basis for separation, Supreme Court decisions have established the rule that rates may not be set so as to require one class of consumers to subsidize another class. In *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), the Court considered an appeal from a decree enjoining railroads from making rate schedules other than those prescribed by Nebraska law. The Court stated, in part:

> It is further said, in behalf of the appellants, that the reasonableness of the rates established by the Nebraska statute is not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the court should take into consideration, among other things, the whole business of the company; that is, all its business, passenger and freight, interstate and domestic. If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic business that would bring no reward and be less than the services rendered are reasonably worth? Or, must the rates for such transportation as begins and ends in the state be established with reference solely to the amount of business done by the carrier wholly within such state, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and

---

**40.** *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 588, 65 S.Ct. 829, 833, 89 L.Ed. 1206, 1215 (1945). The opinion then rejected the gas company's objections to the FPC allocation method:

> Reliance for [the position that a segregation of the physical property based upon use is necessary so that payment due for the use of property which is in the public service may be determined] is rested on the Minnesota Rate Cases [*Simpson v. Shepard*], 230 U.S. 352, 435, 33 S.Ct. 729, 755, 57 L.Ed. 1511, [1556,] 48 L.R.A., N.S., 1151, Ann.Cas. 1916A, 18, and *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 146, 51 S.Ct. 65, 68, 75 L.Ed. 255, [261]. Those were cases which involved state regulation of intrastate rates of companies doing both an intrastate and interstate business. But the rule fashioned by this Court for use in those situations was not written into the Natural Gas Act. Congress indeed prescribed no formula for determining how the interstate wholesale business, whose rates are regulated, should be segregated from the other phases of the business whose rates are not regulated. . . . If Congress had prescribed a formula it would be the duty of the Commission to follow it. But we cannot say that under the Natural Gas Act the Commission can employ only one allocation formula and that formula must entail a segregation of property. A separation of properties is merely a step in the determination of costs properly allocable to the various classes of services rendered by a utility. But where as here several classes of services have a common use of the same property difficulties of separation are obvious. Allocation of costs is not a matter for the sliderule. It involves judgment on a myriad of facts. It has no claim to an exact science. But neither does the separation of properties which are not in fact separable because they function as an integrated whole.

> 324 U.S. at 589, 65 S.Ct. at 833, 89 L.Ed. at 1214–15. (citation omitted)

cost of its interstate business, and the value of the property employed in it? If we do not misapprehend counsel, their argument leads to the conclusion that the State of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation, in respect to its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it.[41]

Subsequently, the Supreme Court built on *Smyth v. Ames* in deciding *Simpson v. Shepard (The Minnesota Rate Cases)*, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), three appeals from decrees enjoining enforcement of intrastate rates of interstate carriers as fixed by the State of Minnesota and enjoining adoption and maintenance of such rates by the carriers. In discussing whether the state's acts and orders were confiscatory, the Court stated, in part:

> Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates

fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. This was also ruled in the *Smyth* Case . . . . The reason, as there stated, is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business.

In the present cases the necessity of this segregation of the domestic business in determining values and results of operation was recognized by both parties.[42]

Several subsequent cases have followed the approach of *Smyth v. Ames* and the *Minnesota Rate Cases*.[43] However, other decisions [44] have concluded that separation of intrastate and interstate business is not compelled by the reasoning of these cases or by the jurisdictional limits expressed in *Smith v. Illinois Bell Telephone Co.* See in particular *Capital Transit Co. v. Public Utilities Commission*, 93 U.S.App.D.C. 194, 213 F.2d 176 (1954), and *State ex rel. Allied Daily Newspapers of Washington v. Wash-*

---

**41.** *Smyth v. Ames*, 169 U.S. 466, 540–41, 18 S.Ct. 418, 431–432, 42 L.Ed. 819, 847 (1898).

**42.** *Simpson v. Shepard* (Minnesota Rate Cases) 230 U.S. 352, 435, 33 S.Ct. 729, 755, 57 L.Ed. 1511, 1556 (1913).

**43.** *See Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 593–94, 65 S.Ct. 829, 835, 89 L.Ed. 1206, 1218 (1945); *see also Northern Pac. R. Co. v. Department of Pub. Works*, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836 (1925); *Mississippi River Fuel Corp. v. Federal Power Comm'n*, 82 U.S.App.D.C. 208, 226, 163 F.2d 433, 451 (1947); *Southwestern Bell Tel. Co. v. City of San Antonio*, 75 F.2d 880 (5th Cir. 1935); *Re General Tel. Co. of Fla.*, 29 P.U.R.3d 29, 52 (Fla. RR & Pub. Util. Comm'n 1959).

In *Federal Power Comm'n v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the United States Supreme Court held

that the FPC properly could consider alleged discriminatory and non-competitive effects which a rate under FPC regulation might have on rates which were not regulated by the FPC. The commission could then select an appropriate rate within the zone of reasonable rates in light of such possible effects. However, the court reaffirmed the need for a separation of the regulated and unregulated portions of the power company's business when setting rates for the regulated operations.

**44.** *See, e.g., County Bd. of Arlington Co. v. United States*, 101 F.Supp. 328, 331 (E.D.Va. 1951); *see generally Chicago Bd. of Trade v. United States*, 96 U.S.App.D.C. 56, 223 F.2d 348, 353 (1955); *Re United Tel. Co. of Fla.*, 74 P.U.R.3d 433 (Fla. Pub. Serv. Comm'n 1968); *Re West Coast Tel. Co.*, 27 P.U.R.3d 489 (Ore. Pub. Util. Comm'n 1958).

*ington Public Service Commission,* 44 Wash.2d 1, 265 P.2d 270 (1953).[45]

█ Thus, although the Supreme Court of the United States had indicated in opinions other than *Lindheimer v. Illinois Bell Telephone,* that integrated company ·operations properly may be used in rate-making under limited conditions,[46] we think the APUC's position contravenes the Supreme Court's prohibition on hidden subsidies as expressed in *Smyth v. Ames* and the *Minnesota Rate Cases.* In the case at bar, the APUC has apparently proceeded on the assumption that in determining whether confiscation has occurred, supplementation of intrastate revenues by interstate revenues is permissible.

Petitioners make the further contention that the superior court erred in substituting its judgment for the conclusions of the commission and that the APUC's determinations should be upheld if they meet the "reasonable basis" test articulated by this court in *Kelly v. Zamarello,* 486 P.2d 906, 911, 916 (Alaska 1971).

*Jager v. State,* 537 P.2d 1100, 1107 n.23 (Alaska 1975), noted that this court has recognized at least four principal standards of review for administrative decisions:

> These are the 'substantial evidence test' for questions of fact; the 'reasonable ba-

sis test' for questions of law involving agency expertise; the 'substitution of judgment test' for questions of law where no expertise is involved; and the 'reasonable and not arbitrary test' for review of administrative regulations. (citations omitted)

*Jager* involved an APUC decision not to initiate a thorough rate investigation in response to Jager's allegations that certain utility rates were unjustly discriminatory. We declined to apply the "independent judgment" and "substantial evidence" tests but determined that the commission's decision whether to conduct a rate investigation is similar to the type of agency expertise in a mixed law and fact setting which is subject to the "reasonable basis" standard of review outlined in *Kelly v. Zamarello,* 486 P.2d 906, 916–17 (Alaska 1971). We explained:

> The reasonable basis standard permits the court to consider factors of agency expertise, policy, and efficiency· in reviewing discretionary decisions. It is similar to the standard of 'unreasonable, arbitrary, and capricious action' under which actions committed to agency discretion are traditionally reviewed when they are subject to review at all. The reasonable basis standard is appropriate for determining whether the agency deci-

**45.** In discussing decisions of the United States Supreme Court which had required separation of intrastate and interstate business, the Washington Supreme Court stated:

> The holding in each case that the property used, the revenue received, and the costs incurred in intrastate business must be segregated in determining whether the intrastate rates fixed were adequate seem to have been based upon two propositions: First, that an insufficient rate for intrastate business cannot be justified on the theory that it was offset by more than an adequate income from interstate business and, secondly, that a possible conflict between state and Federal regulatory agencies must be avoided.
>
> However, the supreme court has modified the rule requiring such segregation in certain later cases where particular facts or circumstances required.    .   .   .
>
> .      .      .      .      .
>
> The rule to be derived from these cases is that a segregation of intrastate and interstate

properties, expenses and revenues *is not necessary in all cases.* A state regulatory commission can legally consider the entire operation of a utility where it is an integrated system with its intrastate and interstate business intimately bound together, provided that the commission restricts itself to the fixing of rates over which it has jurisdiction without interfering with Federal authority.

*State ex rel. Allied Daily Newspapers of Washington v. Washington Pub. Serv. Comm'n,* 44 Wash.2d 1, 265 P.2d 270, 277–78 (1953).

**46.** The circumstances which have led to such relaxation of separation requirements are (1) complex, highly integrated operations, (2) absence of an attempt by the agency to affect or consider rates not within its jurisdiction, and (3) avoidance of discriminatory rates which subsidize one set of ratepayers through rates paid by another.

sion has been undertaken 'in the manner required by law.' [47]

██ This court also discussed the reasonable basis test in *Alaska Public Utilities Commission v. Greater Anchorage Area Borough,* 534 P.2d 549, 558–59 (Alaska 1975):

> This standard is invoked in cases where the agency action involves either questions of fundamental policy formulation or an assessment of technical data related to complex subject matter which requires the particularized knowledge and experience of the administrative personnel for their determination. Generally speaking, the orders of a rate-making board would come within this latter class and be subject to the reasonable basis test. However, in cases where there has been a substantial showing that the existing rates are confiscatory, an administrative decision which results in the prolonged continuation of such rates will rarely be found to have a rational basis. (footnotes omitted)

The foregoing language implicitly recognizes that a court may evaluate the showing of confiscation. That is, although the process of determining whether a rate is confiscatory involves fact/law determinations which require the special competence of the commission,[48] the ultimate issue in confiscation questions is whether due process will be violated by the continued operation of the rate.

██ Evaluations of constitutionality and other "pure" issues of law are within the special expertise of the courts rather than the agency.[49] Determinations of legal questions often do not depend upon fundamental agency policy formulation or upon "[assessments] of technical data related to complex subject matter which requires the particularized knowledge and experience of the administrative personnel for their determination."[50] Thus, review of agency determinations involving questions within the particular expertise of the judiciary appropriately involves the court's "substitution of judgment." Where the question being addressed involves determinations of law or fact which require the special skills of the administrative agency, the "reasonable basis" standard is more appropriate. For example, determination of the necessity of jurisdictional separations requires understanding of doctrines related to preemption and discrimination; judicial substitution of judgment is therefore appropriate. When those principles are applied to reach a specific conclusion regarding the adequacy of the rate, agency expertise may be more significant.

██ On the basis of the foregoing, we conclude that the superior court did not err in the standard of review it employed. The primary questions raised by the respective petitions were whether intrastate-interstate separations were necessary and whether the APUC was bound to accept RCAA's methods of separating data calculated in accord-

**47.** *Jager v. State,* 537 P.2d 1100, 1107–08 (Alaska 1975) (footnotes omitted). For other discussions of "reasonable basis" and "reasonable and not arbitrary," see *Union Oil Co. of Cal. v. Department of Revenue,* 560 P.2d 21, 23 (Alaska 1977); *Mobil Oil v. Local Boundary Comm'n,* 518 P.2d 92, 98 (Alaska 1974); *Swindel v. Kelly,* 499 P.2d 291, 298 (Alaska 1972); *Kelly v. Zamarello,* 486 P.2d 906, 911–13 (Alaska 1971); *Pan American Petroleum Corp. v. Shell Oil Co.,* 455 P.2d 12, 21–23 (Alaska 1969).

**48.** To some extent, the comparative financial figures upon which the ultimate conclusion is based, *e. g.,* return on rate base and reasonable return on enterprises having comparable risks, are derived through accounting and adjustment techniques or evaluations of industry performance which require specialized expertise as ap-

plied to complex data. This court has previously separated administrative choices of policy from judicial determinations of law. *See Union Oil Co. of Cal. v. Department of Revenue,* 560 P.2d 21, 24 (Alaska 1977).

**49.** *See generally Union Oil Co. of Cal. v. Department of Revenue,* 560 P.2d 21, 23 (Alaska 1977); *Alaska Pub. Util. Comm'n v. Municipality of Anchorage,* 555 P.2d 262, 266 (Alaska 1976); *State v. Aleut Corp.,* 541 P.2d 730, 736–37 (Alaska 1975); *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.,* 516 P.2d 408, 412 (Alaska 1973).

**50.** *Alaska Pub. Util. Comm'n v. Greater Anchorage Area Borough,* 534 P.2d 549, 558–59 (Alaska 1975). (footnote omitted)

**508**

ance with 3 AAC 48.430. It is clear that such questions may be reviewed by a court in accordance with the "substitution of judgment" standard. Further, the question of what rates are confiscatory ultimately involves constitutional issues which are within the special competence of the courts.[51]

■ At this point, some of the remaining issues which have been raised by petitioners will be discussed briefly before we turn to the question of protecting consumers who bear the interim rate increase. Implicit in the several holdings we have heretofore articulated is our overall determination that the superior court's supplemental conclusion of law is fully justified, i. e., that

> RCAA has made a *serious* and *substantial* showing that, on an allocated basis and with reference to its intrastate operations, expenses, and investment, *its existing intrastate rates are confiscatorily low.* (emphasis furnished)

Further, we think the superior court's additional conclusion of law that "[i]f an interim rate increase is not granted, RCAA will continue to suffer irreparable harm" is equally justified. In short, we have concluded that the superior court was correct in its determination that all the criteria of *APUC v. GAAB* had been met by RCAA.

It is also urged that the APUC's denial of interim rate relief should be upheld because of RCAA's failure to file for a permanent rate increase prior to its filing for an interim rate increase. It is argued that this omission on the part of RCAA deprived the APUC of jurisdiction and authority to grant interim rate relief, and further that because of its failure to file, RCAA is "estopped" from seeking such relief.

■ We think there is little merit in this jurisdictional-estoppel contention. As we noted at the outset, extensive hearings were conducted by the APUC in relation to the interim rate requested by RCAA. Neither prior to these hearings nor in its "Order Denying Interim Rate Relief" did the APUC seek to dispose of the matter on either jurisdictional or estoppel grounds. Further, none of the parties during the hearing before the Commission challenged the APUC's jurisdiction to grant interim relief. Its findings, contained in the order denying the interim rate request, alluded to the subject of a permanent rate filing but did not employ RCAA's failure to first file for a permanent rate increase as a rationale for its denial order.[52] Additionally, the provisions of AS 42.05.411 cut against petitioners' argument. This statute provides only that a filing of a new or revised tariff be made, it contains no requirement that the tariff be permanent or interim in nature. *See also APUC v. GAAB, supra.*

■ Petitioners also have advanced the contention that the superior court improperly considered RCAA's complaint for injunctive relief as an action separate from an appeal of an administrative agency's order pursuant to Appellate Rule 45 and AS 44.62.570. In light of the provisions of AS 44.62.560(e)[53] and our discussions in *Alaska Public Utilities Commission v. Greater Anchorage Area Borough,* 534 P.2d 549, 556 (Alaska 1975), and in *A. J. Industries, Inc. v. Alaska Public Service Commission,* 470 P.2d 537, 539 (Alaska 1970),[54] we hold that

---

**51.** The "reasonable basis" test may still be applied to the overall rate decision of the APUC, as suggested by *GAAB.*

**52.** The APUC's findings reads:

> On June 15, 1977, RCAA filed a request with the Commission for an 87% interim rate increase to be applied across-the-board to all of RCAA's existing intrastate rates to yield additional annual revenues of approximately $18.5 million. RCAA did not request permanent rate relief in its June 15, 1977 filing but indicated that it would do so by October 15,

1977. The submission of the permanent rate filing was subsequently deferred by RCAA until after the final order is issued in this proceeding.

**53.** AS 44.62.560(e) provides, in part:

> The superior court may enjoin agency action in excess of constitutional or statutory authority at any stage of an agency proceeding.

**54.** *See generally* 3 K. Davis, Administrative Law Treatise §§ 23.04, 24.05 at 425 (1958).

the superior court was correct in concluding that a complaint for injunctive relief is distinct from an appeal of an administrative order.[55]

The APUC stated in its Order Denying Interim Rate Relief that "because of the magnitude of the proposed rate increase and the diversity of RCAA's services and ratepayers, the conventional refund procedures or the alternatives proposed have serious deficiencies." The APUC mentioned two problems associated with providing refunds in the event the permanent rate proceeding indicates that the interim increase was excessive. First, the commission noted difficulties in matching future refunds with present ratepayers; this problem is illustrated by the situation in some rural areas which have a single telephone that is used by many different consumers, although they do not all appear on RCAA's subscriber rolls. Second, the commission recognized the inadequacy of a refund as protection against nonquantifiable harm resulting from curtailment of telephone-dependent services because higher rates preclude operation at previous levels; rural emergency health care delivery systems are one example.[56] Based upon these concerns, the commission concluded that consumers would not be protected to the extent required by this court's opinion in *APUC v. GAAB*, 534 P.2d 549, 555–56 (Alaska 1975).

After considering the record before the APUC, the superior court determined that a feasible refund system was available to protect consumers of intrastate telephone service in the event a permanent rate increase eventually was denied.

■ In its conclusions of law, the court stated:

There are methods of treating any excess revenues which RCAA may collect during the period that any interim rates are in effect, which will reasonably and adequately accommodate and protect the legally cognizable interests of RCAA's subscribers taken as a whole and the method set forth in No. 7 of the Findings of Fact is adopted. For purposes of this order, excess revenues mean revenues collected by RCAA under Alaska Public Utilities Commission rate authorization on an interim basis, whether in the aggregate or by class of customer or service, which exceed the rates that the Alaska Public Utilities Commission authorizes RCAA to collect in its final order in RCAA's permanent rate application.[57]

We agree with the superior court that a refund mechanism can be designed which provides sufficient protection to consumers and which thus meets the requirements of *GAAB*. However, we conclude that the superior court erred in selecting the particular procedure which it adopted.

**55.** An underlying rationale for our decision to remand this matter to the superior court for supplemental findings of fact, conclusions of law and study of the record of the proceedings before the APUC was the conclusion that the superior court's initial grant of injunctive relief was entered all too hastily. Thus, although we now approve of the superior court's grant of injunctive relief, we caution that in complex matters such as these, greater deference should be given than was to such matters as the sufficiency of notice of injunctive hearings, as well as to the parties to whom notice should be given in the particular context of the litigation.

**56.** As the APUC notes in its order denying interim rate relief, the Area Director of the Native Health Service testified that 80% of the service's budget for emergency medical communications represents payments to RCAA. A rate increase of the magnitude proposed by

RCAA "would not mean merely curtailment, but likely cancellation of this long-sought, life-saving program."

**57.** The superior court's Finding of Fact No. 7 stated:

There are several methods to protect the economic interests of those persons who would pay the increased rates if the permanent rate increase is less than the interim rate increase. The least expensive method and the method of refund most likely to reach the individuals and groups of ratepayers who may have paid refundable rates is for the Alaska Public Utilities Commission to order a reduction of rates from the permanent rates which are established for a period of time similar to the period over which the excess rates may have been collected sufficient for reimbursement.

Implicit in the *GAAB* criteria[58] is the assumption that consumers are protected most effectively when the ratepayer who bears the burden of the increased rates also receives the benefit of a subsequent refund from revenues generated by such rates. We think the same assumption is appropriate in the case at bar. In addition, a second basis for requiring a fair refund procedure is to avoid the utility's retention of excess interim rate revenues. The superior court's conclusion that an indirect refund through subsequent rate reductions is the most appropriate refund mechanism adequately addresses this second concern, but it does not attempt to trace the refund to the consumer who originally paid the higher rate.[59] We conclude that any refund procedure should address the problem of tracing refunds to the consumers who accounted for the refundable excess.[60]

The APUC's Order Denying Interim Rate Relief discussed and rejected three proposed refund alternatives: direct refunds based upon customer records, temporary rate reductions for intrastate long distance services until excess payments have been distributed to consumers, and retention of excess revenue from interim rates as contributed capital at zero cost. The APUC concluded that the "rate reduction" and "contributed capital" methods were neither accurately directed to the original ratepayers nor readily understood by consumers as refunds.

On the other hand, the "direct refund" method has the advantage of potentially accurate matchups between interim ratepayers and subsequent refund recipients; but its administrative costs could be prohibitive—depending upon the extent of tracing required by the plan. The APUC concluded that the task of tracing a rate increase to the ultimate consumer "would present almost insurmountable accounting and administrative barriers." Specifically, the commission noted that the problem of tracing refunds to interim ratepayers is complicated by the combined effects of the highly mobile population of Alaska, the heavy dependence upon intrastate long distance service in Alaska due to the state's unique characteristics, and the seasonal variation in telephone calling patterns.

The commission's evaluation of the feasibility and cost of a refund plan ordinarily would be reviewed in accordance with either the "substantial basis" or the "reasonable basis" tests because the commission's findings of fact or evaluations of complex technical data are involved. In the case at bar, however, we think the APUC's conclusion—that no adequate refund procedure exists—must be rejected because it is based upon an erroneous interpretation of the requirements established by *APUC v. GAAB,* 534 P.2d 549 (Alaska 1975). *GAAB* does not require an exact correlation between interim ratepayers and potential refund recipients. Instead, we recognized in *GAAB* that the escrow procedure contained imperfections which resulted in a small class of renters facing a small potential loss. The opinion further explained:

> Indeed, where other methods are undesirable because of high administrative costs or where tracing to the ultimate consumer is impossible, some form of indirect refund may be an appropriate way of safeguarding consumers during the time an interim rate increase is in effect. Such a refund method may also be supplemented by other measures to provide consumers with adequate protection. However, where the interim ratepayers and refund recipients can be matched at reasonable administrative cost, we think the better practice is to provide for direct refunds to consumers who paid the rates which produced the excess revenue.

**58.** *Alaska Pub. Util. Comm'n v. Greater Anchorage Area Borough,* 534 P.2d 549, 554, 557 (Alaska 1975).

**59.** Indirect rate refunds frequently have been approved in connection with utility rates. *See In re Northwestern Bell Tel. Co.,* 299 Minn. 1, 216 N.W.2d 841, 858–59 (Minn.1974); *In re Southern Bell Tel. & Tel. Co.,* 71 P.U.R.3d 152 (Fla. Pub. Serv. Comm'n 1967). *See generally Illinois Bell Tel. Co. v. Moynihan,* 38 F.2d 77 (N.D.Ill.1930), *aff'd sub nom. Smith v. Illinois Bell Tel. Co.,* 269 U.S. 531, 46 S.Ct. 22, 70 L.Ed. 397 (1925) (per curiam).

**60.** We do not mean to imply that the refund procedure adopted by the superior court would never be acceptable as a protective mechanism.

The fact that a relatively few renters face a small loss is not alone substantial enough to tip the balance of hardships against the utility in this case.[61]

We think the APUC's description of the "direct refund" approach demonstrates that it can be adapted to reduce to "a relative few" the number of ratepayers who are excluded from the refund process. Telephone subscribers are in no worse position than were the renters discussed in *GAAB* with regard to subsequent refunds. As the commission notes, the real problem arises because of Alaska's highly mobile population, its large number of seasonal visitors, and its unique rural telephone service areas. We believe the latter concern can be addressed adequately by requiring that RCAA provide technical assistance to rural areas to facilitate whatever recordkeeping is necessary to assure refunds for consumers who actually paid interim rates. Similarly, the problems of a mobile subscriber population can be mitigated by RCAA's coordinating refund efforts with organizations which account for substantial numbers of short-term residents, e. g., military bases. Informational enclosures with subscriber billings could also be used to maximize the likelihood that consumers who have moved to new addresses will be locatable should a refund become necessary. The refund problems resulting from Alaska's large visitor population during the summer months are more difficult and perhaps can be solved only at great administrative cost. As we have noted, however, the *GAAB* criteria do not require a perfect correlation between interim ratepayers and potential refund recipients as long as the consumers who are not adequately protected by refund procedure constitute a relatively small group which neither bears a discriminatory burden nor suffers substantial harm. In the case at bar, the commission's order contains no findings which indicate the extent of the harm which would be suffered by short term visitors; however, we think it apparent that the harm suffered by short time visitors is not so substantial as to tip the balance of hardships away from the utility in the case at bar.

■■■ As we have noted, the other problem posed by RCAA's rate increase is the possible curtailment of crucial health and safety programs which now serve rural Alaska. However, confiscatory rates may not be justified simply because of the social impact which would result from a nonconfiscatory rate.[62] Such factors nevertheless may be appropriate for the commission's consideration in determining at what level within the zone of reasonableness a rate should be set.[63]

Although we have determined that a refund procedure can be selected which meets the requirements of *GAAB*, the choice of appropriate components properly is left to

61. *Alaska Pub. Util. Comm'n v. Greater Anchorage Area Borough,* 534 P.2d 549, 556 (Alaska 1975).

62. The petitioners and an amicus curiae also suggest that reduced use by consumers resulting from increased intrastate rates should be considered in determining whether consumers can be protected adequately for purpose of the *GAAB* test. Whenever rates for utility services are increased, an impact upon consumers results; that impact is particularly severe for consumers having limited financial resources. However, reduced utilization of the service which results from higher costs per unit of use is a harm against which no refund procedure can protect. While we do not preclude consideration in an appropriate case, of a rate revision's social impact in the balance of hardships established by *GAAB*, we are not persuaded that deterrence of use in the instant case is sufficient to shift the balance of hardships in favor of petitioners. We also note that both constitutional and statutory requirements preclude setting a rate which is confiscatory—despite possible hardships which result from the non-confiscatory rate. Thus, deterrence of use may not be invoked to justify a confiscatory rate, although circumstances may exist in which consideration of the rate's ultimate effect may be used to determine where in the zone of reasonableness a rate is eventually placed. *Cf. Federal Power Comm'n v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976) (FPC had jurisdiction to consider allegations that non-competitive effect would result from proposed wholesale rate for electricity).

63. Our discussion of the refund procedure does not imply that other measures within the power of the APUC or of the court may not be used to protect the interests of consumers or other parties opposing the rate increase.

the APUC and its special expertise. Accordingly, the superior court's order is vacated insofar as it purports to accept the "rate reduction" refund method, and the superior court is directed to remand the matter to the APUC for selection of appropriate refund methods and other protective measures which maximize the likelihood that refunds will go to consumers who actually paid the increased rates while keeping administrative costs at a reasonable level. On remand, the commission shall also determine whether a secondary refund plan will be necessary to avoid RCAA's retention of excess revenue which is not refunded initially.[64]

One other matter remains for our consideration.[65] The APUC's Order Denying Interim Rate Relief indicated that a complete review of specific components in the RCAA interim rate relief filing had not been conducted.[66] In addition, the Commission stated that it had questions about certain items.[67] The APUC's order is ambiguous

concerning the extent to which these factors entered into the Commission's evaluation of the requested rate increase. Conceivably, had the Commission evaluated RCAA's filing in accordance with the principles discussed in this opinion, it might have concluded that the interim increase should be at a rate other than 87%. Although we express no opinion as to the correctness of such a determination, the Commission is empowered on remand to consider such matters in greater detail.

To the extent this court's order of May 19, 1978, is inconsistent with the foregoing opinion, the order is hereby modified.

Affirmed in part, vacated and remanded in part.

MATTHEWS, J., not participating.

### OPINION ON REHEARING

### PER CURIAM.

At the request of petitioners, we granted a limited rehearing "as to the question

---

64. The refund procedure eventually adopted may result in an incomplete distribution of refundable revenues. That is, because a relatively small number of consumers will have paid the interim rates without receiving a refund, RCAA may be left with a residual amount of excess rates collected during the interim period. In order to avoid RCAA's unjust enrichment through retention of such revenues, the APUC appropriately may consider whether a supplemental refund procedure is necessary.

65. We have considered the petitioners' additional arguments and have concluded that they are without merit.

66. The APUC's Order Denying Interim Rate Relief contained the following note:

The APUC Staff witness, Powers, in the pre-filed testimony . . . said he assumed the accuracy of RCAA's statistics and figures found in the utility's filing, but made several adjustments, including disallowance of Construction Work in Progress (CWIP), Plant Held for Future Use and Plant Acquisition Adjustment from rate base for a net reduction from rate base of $1,019,785, including necessary adjustments to working capital. Staff also amortized rate case expenses over a three-year period, disallowing them as a single lump sum; and, finally, disallowed Interest During Construction from revenues to conform to the disallowance of CWIP. Staff conceded it had 'not conducted any review' of the RCAA filings, supporting

exhibits and work papers other than to make an inventory of them to satisfy the Commission that the filing requirements levied on the utility had been satisfied, i. e., no in-depth staff audit of RCAA accounts, rate base, etc., took place prior to the public hearing.
Order Denying Interim Rate Relief, Docket No. U–77–53, Order No. 2 at 5 n.6 (Alaska Pub. Util. Comm'n, Nov. 22, 1977).

67. More specifically, the APUC order referred to " 'serious' and 'substantial' questions concerning the utility's filing . . . ." *Id.* at 21. Among these matters were a variety of items including: adjustments to rate base, operating expenses, and revenue requirements; accounting for revenues and expenses related to certain RCAA communications services; "pro forma" adjustments regarding RCAA's settlement arrangements with connecting telephone companies in Alaska; absence of "pro forma" adjustments to revenues and expenses representing effects of Phase I or Phase II of rate integration on RCAA's rate integration study; potential overstatement of revenue requirements due to misallocation of RCAA's investment in station equipment (as well as misallocation of certain other items); inclusion in revenue requirements of sums representing payments under a management contract with RCAA's parent corporation; and issues related to the treatment of taxes paid to the parent corporation. *Id.* ¶¶ (a)–(h) at 21–23.

whether, in light of the whole record made before the Alaska Public Utilities Commission, respondent RCA Alaska Communications, Inc., made a serious and substantial showing in the superior court of confiscation under the criteria of *Alaska Public Utilities Commission v. Greater Anchorage Area Borough*, 534 P.2d 549 (Alaska 1975)."[1] We denied the original and supplemental petitions for rehearing in all respects as to other issues raised therein.

Therefore, we decline to consider the arguments of petitioners and amici curiae that the "Ozark" separations methodology provides an inappropriate and inaccurate basis for assessing RCAA's showing of confiscation. We adhere to the view expressed in our previous opinion that the use of the "Ozark" methodology by the Alaska Public Utilities Commission was mandatory in this case and that, in the context of its own regulations and conduct in processing RCAA's application for interim rate relief, the Commission "was required to accept RCAA's separations data based upon the February 1971 edition of the Separations Manual published by the National Association of Regulatory Utility Commissioners (the Ozark methodology)." 597 P.2d 489 at 499 (Alaska 1978).

 The issue thus framed is whether RCAA made the required showing of confiscation as to intrastate operations as determined by the "Ozark" methodology. RCAA's burden in that regard was to "raise 'serious' and 'substantial' questions going to the merits of the case; that is, the issues raised cannot be 'frivolous or obviously without merit.'" *Alaska Public Utilities Commission v. Greater Anchorage Area Borough*, 534 P.2d 549, 554 (Alaska 1974).

Based on our review of the arguments of the parties and the record before the Commission, we find that RCAA did meet this rather minimal burden of proof. While not entirely uncontroverted, the case presented by RCAA to the Commission did raise "serious" and "substantial" questions and was not refuted by evidence which compels the conclusion that RCAA's claim of intrastate confiscation was "frivolous or obviously without merit."

On rehearing, having concluded that the superior court's findings of fact as to this issue were not clearly erroneous,[2] we affirm our previous opinion in this case.

MATTHEWS, J., not participating.

---

1. In granting the petitions for review in this case, we entered an order directing the superior court to consider the full record of the proceedings before the Alaska Public Utilities Commission and to make detailed and explicit findings of fact and conclusions of law. However, at the time of our initial consideration of those petitions the full record of the Commission proceedings was not before this court. In granting the petitions for rehearing, we ordered the record in this court supplemented to include the full record of those proceedings.

2. A "clearly erroneous" finding, which may be set aside on review, is one which leaves us with a definite and firm conviction on the entire record that a mistake has been made. *See, e. g., Frontier Saloon, Inc. v. Short*, 557 P.2d 779, 781–82 (Alaska 1976) (per curiam).

Some of the superior court's findings of fact with respect to the evidence of intrastate confiscation presented by RCAA were set out in our previous opinion in this case. See 597 P.2d at 492, 493 (Alaska 1978).